

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 2-07-117-CV

| | |
|---|---|
| ROBERT D. SMITH, CRAIG B. LYON, CARL WALCHSHAUSER, THE FRANKIE R. PUTNAM, SR. TRUST, FRANK PUTNAM, INDIVIDUALLY, THE CLEAR CREEK AIR ESTATES PROPERTY OWNERS ASSOCIATION, INC., AND ROBERT E. ADAMS | APPELLANTS |

### V.

| | |
|---|---|
| BENJAMIN F. HUSTON, MARY E. HUSTON, BENJAMIN E. HUSTON, DIANA A. HUSTON, THOMAS WESSIE HUSTON, CRISTY R. HUSTON, AND DIANE CRAWFORD | APPELLEES |

### AND

| | |
|---|---|
| BENJAMIN F. HUSTON, MARY E. HUSTON, BENJAMIN E. HUSTON, DIANA A. HUSTON, THOMAS WESSIE HUSTON, AND CRISTY R. HUSTON | CROSS-APPELLANTS |

### V.

| | |
|---|---|
| ROBERT D. SMITH, CRAIG B. LYON, CARL WALCHSHAUSER, THE FRANKIE R. PUTNAM, SR. TRUST, FRANK PUTNAM, INDIVIDUALLY, THE CLEAR CREEK AIR ESTATES PROPERTY OWNERS ASSOCIATION, INC., AND ROBERT E. ADAMS | CROSS-APPELLEES |

FROM PROBATE COURT OF DENTON COUNTY

**OPINION**

This appeal involves a dispute over access to and fees associated with a shared airstrip servicing the Clear Creek Air Estates subdivision in Sanger, Texas. In two issues, appellants Robert B. Smith, Craig B. Lyon, Carl Walchshauser, The Frankie Putnam Sr. Trust, Frank Putnam individually, Robert Adams (collectively, the lot owners), and the Clear Creek Air Estates Property Owners Association, Inc. challenge the parts of the trial court's judgment (1) awarding breach of contract damages to appellees Benjamin F. Huston, Mary E. Huston, Benjamin E. Huston, Diana A. Huston, Thomas Wessie Huston, and Cristy R. Huston,[1] (2) rendering declaratory judgment allowing the owner of the airstrip to collect annual fees as set forth in easement agreements giving the lot owners access to the airstrip, regardless of the reasonableness of those fees

---

[1] Although appellants named Diane Crawford as an appellee in their docketing statement, they do not challenge the part of the trial court's judgment dismissing their claims against her; the trial court did not enter any other judgment with respect to Crawford.

2

and without giving an accounting, and (3) awarding attorneys' fees to the Hustons under section 38.001 of the civil practice and remedies code.[2] TEX. CIV. PRAC. & REM. CODE ANN. § 38.001 (Vernon 1997). Appellees bring a cross-appeal in which they challenge the part of the trial court's judgment (1) rendering a declaratory judgment prohibiting the Hustons from denying the lot owners access to the airstrip if they have not paid all fees due under the easement agreements and (2) awarding attorneys' fees to the Hustons under section 37.009 of the civil practice and remedies code. *Id*. § 37.009 (Vernon 1997). We affirm.

**Background Facts**

Appellees Benjamin F. (Ben) and Mary E. Huston bought 324.625 acres of land in Sanger, Texas in 1978. They financed their purchase and subsequent development of the land with loans from First State Bank of Gainesville. Six years later, in November 1984, they filed a plat in the Denton County records, which divided the easternmost part of the property into lots for the purpose of creating a housing development adjacent to an airstrip located on their remaining undivided acreage. The development was to be known as Clear Creek Air Estates. The platted lots abutted the east side of the two hundred

---

[2] This complaint is contingent upon our disposition of appellants' issue relating to breach of contract damages.

3

foot wide airstrip; all the land west of the airstrip remained undivided acreage.

Ben and Mary also recorded covenants, conditions, and restrictions affecting

the platted lots.

On July 8, 1985, Ben and Mary sold Lot 5, Block B.  The conveyance

included a "nonexclusive easement for aircraft for flight and taxiway purposes

along, over and across" the airstrip, which was described in an exhibit attached

to the deed.  The following language was included in Exhibit A, immediately

following the legal description of the airstrip:

Such easement is subject to the following:

(1) Rules and regulations as established and amended from time to time by the owner and/or manager of the airport, such airport situated on the 13.008 acre tract described above, and being known as Ironhead [A]irport;

(2)    Grantee has no right to park aircraft or any other personal property upon said easement;

(3)    Grantee has no right to construct buildings or any other structure upon the easement;

(4)    Grantee shall be subject to charge of $200.00 per year for use of airport; Owner and/or Manager of airport shall have right to increase such charge at the rate of 10% annually after the year 1985. Grantee shall pay any such charge within 30 days from date of billing.

In 1987, Ben and Mary defaulted on their loans to the bank.  Instead of

accelerating the loans and foreclosing on the property, the bank allowed them

4

to execute a deed in lieu of foreclosure. In the deed to the bank, which was recorded in the Denton County real property records, Ben and Mary conveyed 232.136 acres from their original 324.625 acre purchase; the conveyance included all the platted lots east of the airstrip except those that Ben and Mary had already sold to third parties. Ben and Mary reserved to themselves four tracts of the westernmost, undivided acreage, including the land on which the airstrip is located. They also agreed to enter into a maintenance agreement with the bank pursuant to which Ben and Mary would maintain the bank's land and the airstrip.

Several years later, the bank filed suit against Ben and Mary, claiming that Ben and Mary were obligated to grant the bank and its transferees access to and use of the airstrip. They eventually entered into a Compromise Settlement Agreement, which was incorporated into an agreed judgment dated April 18, 1991.

As part of the Settlement Agreement, Ben and Mary and the bank agreed to form the Clear Creek Air Estates Property Owners' Association.[3] The Association was to lease the airstrip from Ben and Mary for an initial ten year period with an option to renew the lease for an additional ten years. The

---

[3] Membership in the Association was to be limited to owners of land in or adjacent to Clear Creek Air Estates.

Settlement Agreement also provided that the Association would enter into a maintenance agreement with the party of its choice, effective upon expiration of the maintenance agreement that Ben and Mary and the bank had agreed to in the deed in lieu of foreclosure. The Settlement Agreement further provided that Ben and Mary would continue to maintain the airstrip pursuant to the maintenance agreement referenced in the deed in lieu of foreclosure until that maintenance agreement expired.[4]

The Settlement Agreement set forth other rights and duties of the Association as well, including the rights and duties to provide for "rules and regulations concerning the use of the airstrip and contiguous land," to "[e]stablish the terms and conditions for granting use of the airstrip to members," and to join with the bank, Ben and Mary, or all three whenever necessary "in the preparation, . . . filing and recording of restrictions consistent with the existing restrictions" previously recorded by Ben and Mary on any land abutting the airstrip. The Settlement Agreement also provided for two classes of members in the Association: those who owned lots adjacent to the airstrip and those who owned lots that do not abut the airstrip.

---

[4] A copy of this maintenance agreement is not included in the appellate record, and there is no evidence regarding the date of its commencement or expiration.

6

Regarding access to the airstrip, Ben and Mary and the bank agreed that the bank would pay Ben and Mary $2,500 cash for an easement allowing Lot 1, Block B access to and use of the airstrip. Ben and Mary also agreed to convey like easements in favor of Lots 2–4, 7–8, and 10–11, Block B at the request of the purchaser upon the sale of any of those lots in exchange for the payment of $5,000. In addition, the purchaser of the lots would receive membership in the Association automatically upon closing. The Settlement Agreement sets forth a process by which owners of lots that are not adjacent to the airstrip may purchase access easements from the Association for $2,000, $1,000 of which would be payable to Ben and Mary or "the then owner" of the airstrip. The Settlement Agreement also provides that "[n]o further payments shall be due to [Ben and Mary] in connection with the use of the airstrip or extension thereof or taxiways or access point." The Settlement Agreement concluded by stating that if the Association failed to maintain good standing, dissolved, terminated, or failed to maintain the lease of the airstrip in good standing, any lot owners who paid for access easements "shall continue to have such access, and no further easement, right-of-way, right or grant shall be necessary to allow them such access."

On April 19, 1991, the day after the date of the agreed judgment, Ben and Mary conveyed the Lot 1 access easement to the bank. This document is

7

recorded in the Denton County real property records. In the document, Ben and Mary convey "a nonexclusive easement for aircraft for flight and taxiway purposes along, over and across" the airstrip. Immediately following the legal description are the same "subject to" conditions included in the 1985 Lot 5 access easement, including the language imposing a $200 per year charge payable to the "Owner and/or Manager" of the airport for "use of [the] airport."

In accordance with the Settlement Agreement, the bank incorporated the Association, and the bank's representative, as attorney in fact for the Association, entered into the lease with Ben and Mary as contemplated by the Settlement Agreement.[5] The lease allowed the Association to "occupy and use [the airstrip] as a landing strip for aircraft landing and takeoff, taxiing, and related purposes" pursuant to rules and regulations promulgated by the Association. The lease term was for ten years, beginning June 1, 1991 and ending May 31, 2000; it also provided that the Association could extend the lease for an additional ten years by giving written notice no later than April 2,

---

[5] Texas Secretary of State records show that the articles of incorporation for the Association were dated April 17, 1991. The lease is dated the same day as the Settlement Agreement, April 18, 1991, and is recorded in the Denton County property records. Thus, we consider the Settlement Agreement, the Lot 1 easement, the formation of the Association, and the lease as part of one transaction. *DeWitt County Elec. Coop., Inc. v. Parks*, 1 S.W.3d 96, 102 (Tex. 1999).

2000. The Association agreed to surrender possession of the airstrip to Ben and Mary upon expiration of the lease term. During the lease term, the Association was to be solely responsible for maintenance of the airstrip.

Although the Association entered into the lease with Ben and Mary, it never took possession of the airstrip pursuant to the lease, it never established rules and regulations for use of the airstrip, it never made payments to Ben and Mary as provided in the lease, and it never took over responsibility for maintenance of the airstrip as provided for in the lease and Settlement Agreement. Ben and Mary continued to maintain the airstrip as they had previously.

Ben and Mary subsequently conveyed several access easements to third parties who purchased property from the bank, including some of the lot owners.[6] All of the easements benefitting the lot owners' properties—except

---

[6] Putnam and Adams purchased easements from Ben and Mary in accordance with the procedures set forth in the Settlement Agreement. Lyon and Walchshauser purchased their lots subject to easements that Ben and Mary had already conveyed to previous owners. The easement benefitting Lyon's lot was purchased in accordance with the Settlement Agreement procedures. The easement benefitting Walchshauser's lot was among the first Ben and Mary conveyed, six years before execution of the Settlement Agreement; however, the deed conveying Lot 5 to Walchshauser, which is dated September 15, 1993, two years after execution of the Settlement Agreement, includes verbatim the "subject to" language set forth in Ben and Mary's original easement grant benefitting Lot 5. Smith, who owns Lot 1 and Lot 4, purchased the easement for Block 4 from Ben and Mary in accordance with the Settlement

those affecting Lot 1, Block B (one of Smith's lots) and Lot 5, Block B (Walchshauser's lot) — were purchased by the lot owners, or their predecessors in ownership, years after entry of the agreed judgment incorporating the Settlement Agreement. For example, Smith purchased Lot 4, Block B from the bank on September 10, 1993; that same day, Ben and Mary conveyed an easement and right-of-way upon and across the airstrip "for the use and benefit of" Lot 4. That easement, and all of the other lot owners' easements except those benefitting Lot 1 and Lot 5 contain the following language, which is substantially similar to the "subject to" language in the Lot 1 and Lot 5 easements:

> SUCH EASEMENT IS SUBJECT TO THE FOLLOWING:
>
> (1)    Rules and regulations as established and amended from time to time by the property owner's association which manages the Ironhead Airport under a Lease Agreement;
>
> . . . .
>
> (4)    Grantees shall be subject to the association dues and restrictions established by the property owner's association which manages the Ironhead Airport.
>
> (5)    Grantee shall be subject to charge of $200.00 per year for use of airport; Owner and/or Manager of airport shall have right to

---

Agreement procedures. When Smith purchased Lot 1 in 1998, it was already subject to the easement the bank had purchased from Ben and Mary pursuant to the Settlement Agreement.

increase such charge at the rate of 10% annually after the year 1985. Grantee shall pay any such charge within 30 days from date of billing.[7]

The easement also provides that "[i]n the event of any controversy, claim, or dispute relating to this instrument or the breach thereof, the prevailing parties shall be entitled to recover from the losing party reasonable expenses, attorneys fees, and costs."

On November 15, 1993, Ben and Mary executed a ratification of the easements benefitting Lots 1 and 5, which they recorded in the Denton County property records. The document states that Smith and Walchshauser were concerned that their purchases from the bank may not have properly documented "their purchase of the runway user privileges and rights" and that "their dealings with the Property Owners' Association also may not [have been] properly documented." Ben and Mary ratified and confirmed that Lots 1 and 5 carry with them "the fully paid and nonassessable right and privilege to use the entire runways and taxiways as described in the 13.088 acre tract subject only to the payment of maintenance fees as described in the restrictive covenants."

---

[7] The second and third conditions are exactly the same as those in the Lot 1 and Lot 5 easements.

11

In December 1993, Ben and Mary billed the lot owners $200 for "1994 Runway Use and Maintenance Fee" pursuant to the easement agreements.[8] The next year, they began escalating the runway fee by ten percent per year, which escalation continued at the maximum ten percent per year throughout the litigation. Smith paid the fees through the 1999 calendar year; Walchshauser paid the fees through the 2000 calendar year; and Lyon, Adams, and Putnam paid the fees through the 2001 calendar year.[9] None of the lot owners have paid the Hustons fees pursuant to the easements since the lot owners filed suit against the Hustons on March 30, 2001, at which time the fee was $389.74 per year.

The lot owners initially sued Ben only,[10] alleging, among other things, claims for promissory estoppel, trespass and tortious interference, breach of contract, fraud, breach of fiduciary duty, and appointment of a receiver for the

---

[8] Ben states in an affidavit presented as summary judgment evidence that he "began" billing pursuant to the runway easements after the Association's failure to perform under the lease. Thus, the record shows that the first year for which Ben and Mary charged fees in accordance with the easement agreements was 1994.

[9] Ben sent invoices for fees applicable to each calendar year at the beginning of that year demanding payment for each calendar year in advance.

[10] Appellants added Mary, Ben, Jr., Diana, Wes, Cristy, and Diane Crawford, Ben and Mary's daughter, as defendants in their First Amended Original Petition.

airstrip. The lot owners contended that "the primary issue and dispute" in the case was the interpretation of the "subject to" language in the easements. They also alleged that Ben was arbitrarily interfering with their access rights to the airstrip and harassing them and their guests. They requested both a temporary and permanent injunction and a declaratory judgment construing the parties' rights with respect to the runway, including a declaration that any fees charged under the runway easements must be used for maintenance purposes only, must be only in an amount that is reasonable and necessary for the actual maintenance of the runway, and that Ben must provide the lot owners with a detailed accounting of the fees collected and expended. On April 12, 2001, the trial court granted appellants a temporary injunction pending a final judgment in the case.

On August 8, 2002, Ben and Mary conveyed all of their remaining property, except for a couple of acres upon which their house was located, to their children, Benjamin E. (Ben, Jr.) and his wife Diana, and Thomas Wessie (Wes) and his wife Cristy. The conveyance included the airstrip. After the conveyance, Ben, Jr. and Wes "assumed management and operational responsibilities for the Ironhead Airport." They continued to bill easement holders, including the lot owners, for fees in accordance with the easement agreements, escalating the fees by 10 percent each year.

13

The litigation remained pending for several years. On June 30, 2006, appellants filed a motion for partial summary judgment, in which they requested a declaratory judgment on eleven different grounds related to access and use of the airstrip and payment and assessment of maintenance fees for the airstrip. They did not move for summary judgment on any of their other claims. Appellants contended generally (1) that the Settlement Agreement—specifically the provision prohibiting payments to Ben and Mary in connection with the easements other than the initial purchase price—controls and binds the parties; (2) that access to the runway is separate from, and should not be affected by, "any obligation to pay a maintenance fee or reimburse the owner of the runway the ad valorem taxes thereon"; (3) that the lease should be re-executed and possession of the airstrip should be delivered to the Association or, in the alternative, that the court should order that the Association is the manager of the airstrip; (4) that any maintenance fees charged to lot owners must be reasonable and necessary, must be used for maintenance purposes only, must be in an amount equal to each lot owner's proportionate share, and must be kept in a separate account managed by the Association; and (5) that a fund custodian must deliver an accounting of the fees to the lot owners.

Appellees filed traditional and no-evidence motions for summary judgment, also on June 30, 2006. Appellees contended that appellants could

14

produce no evidence supporting their claims for trespass, tortious interference, breach of contract, and breach of fiduciary duty.[11] They also sought summary judgment denying appellants' claims for declaratory and injunctive relief. As affirmative relief, the Hustons claimed that as a matter of law they were entitled to a judgment against the lot owners for unpaid easement fees, that they were entitled to declaratory relief establishing the opposite of appellants' requests for declaratory relief, and that they were entitled to a declaration that, according to the plain language of the easements, the lot owners' access to and use of the airport is conditioned upon being current with all fees due and owing. Crawford also moved for summary judgment on all of appellants' claims against her on no-evidence grounds.

The parties each filed responses to the others' motions and supplements to their own motions. The trial court heard the competing motions on August 1, 2006. After carefully considering the motions and summary judgment evidence, the trial court granted a partial summary judgment as to all claims except (1) appellants' claim for a permanent injunction and (2) the parties'

---

[11] Appellants abandoned their claims for fraud and appointment of a receiver.

claims for attorneys' fees and litigation costs,[12] both of which the trial court reserved for trial.

The court dismissed all of appellants' claims against Crawford; it also denied and dismissed appellants' claims for trespass, tortious interference, breach of contract, and breach of fiduciary duty.[13] The trial court found that Ben and Mary were entitled to a judgment against the lot owners for unpaid fees through 2002, plus prejudgment interest from March 30, 2001, and that Ben, Diana, Wes, and Cristy were entitled to a judgment against the lot owners for unpaid fees for 2003 through 2006, plus prejudgment interest from March 30, 2001.

The trial court also rendered declaratory judgment as follows:

- That the Association "never functioned in the manner contemplated by the Settlement Agreement" and "never operated or managed the airstrip"; thus, the lease "never came into effect."

- That the Association never had any authority over the airstrip or its operations; thus, "authority and control over the [a]irstrip and its

---

[12] Crawford did not plead for the recovery of attorneys' fees.

[13] Appellants have not challenged these rulings on appeal.

16

operations remained in the hands of . . . [Ben and Mary], and their successors in title to the [a]irstrip."

- That the lease cannot and will not be resurrected as requested by appellants.

- That the lot owners' easements are appurtenant to the title of the lots and run with the title to the lots.

- That the rights and privileges of the lot owners pursuant to the easements are independent of the agreed judgment and Settlement Agreement; thus, the owners of the airstrip "have a duty to not interfere with the free access and use of the" easements, and the owner, or owners, of the easements is obligated to "refrain from arbitrary, capricious, or retaliatory airport management practices, provided, however, all such duties of non-interference are subject to and are to be applied consistent with concerns for aviation safety."

- That Ben, Jr., Diana, Wes, and Cristy are the current owners of the airstrip.

- That the airstrip easements "contemplate the operation of a community airstrip for use by light, general aviation aircraft, excluding Ultralights," and, thus, the owners of the airstrip have both the authority and duty to maintain and supervise the operation of the airstrip consistent with its

17

contemplated use and prudent airport management policies, to be exercised in accordance with concerns for aviation safety and without undue or unnecessary interference with the easement rights of the lot owners.

- That the owners of the airstrip are entitled to charge fees pursuant to the easements, that the 2006 fee was $599.13, that the owner of the airstrip may invoice the fees on or after January 1 of each successive year, beginning January 2007, and that the fees are payable thirty days thereafter.

- That the owner of the airstrip may increase the fee to the lot owners by 10% for 2007 and by an additional ten percent each year thereafter "until a court of competent jurisdiction concludes by final judgment that circumstances developing after entry of the final judgment in this case exist, which would authorize a court to prohibit enforcement of the 10% escalator."

- That the easements "are not subject to forfeiture" and that the failure of a lot owner to timely pay the easement fee "does not authorize the owner(s) . . . to exercise any form of self help, extra-judicial remedies, including, but not limited to, interference in any respect with the right of the [lot owners] to use and enjoy the [a]irstrip, nor does such failure to

18

timely pay permit or authorize any form of non-judicially declared forfeiture of" the easements.

- That if a lot owner fails to timely pay easement fees, the owner of the airstrip "has available for the enforcement and collection of such unpaid fees all normal and customary legal processes for the collection of a debt, including, but not limited to, the availability of the judicial imposition of a charging lien or encumbrance against the [lot owners' lot], plus the additional recovery of interest, attorney's fees and costs as may be found to be appropriately recoverable in any subsequent litigation by a court of competent jurisdiction."

- And that all other claims for declaratory relief are denied "because and for among other reasons, the Court declares that the amount of Runway Fees are not subject to a reasonableness limitation and that the owner(s) of the [airstrip] is not obligated to account for the use of monies received in payment of Runway Fees or to segregate such payments from other funds."

After the trial court rendered the partial summary judgment, appellants nonsuited their claim for permanent injunctive relief; the trial court subsequently conducted a bench trial on the sole issue of whether appellants and appellees were entitled to recover attorneys' fees and litigation costs from each other.

19

After a three day bench trial on attorneys' fees, the trial court issued a final judgment, which incorporated its rulings on the partial summary judgment. It also included its rulings on attorneys' fees, awarding the Hustons attorneys' fees against Smith in the amount of $23,666.66; against Lyon, Walchshauser, Adams, and the Frankie B. Putnam, Sr. Trust in the amount of $11,833.33 each;[14] and against all of the lot owners in favor of the Hustons for conditional fees in the event of an appeal. The trial court further awarded all appellees court costs under rule 131. TEX. R. CIV. P. 131.

After rendering final judgment, in accordance with appellants' request, the trial court entered findings of fact and conclusions of law in connection with its rulings on costs and attorneys' fees. However, the court refused to make any findings of fact and conclusions of law regarding the issues decided on partial summary judgment.

**Issues Presented**

Appellants bring two issues in which they challenge the correctness of the trial court's judgment as a matter of law and contend that they were entitled to judgment as a matter of law. They group their arguments into the

---

[14] The trial court calculated the amount of fees awarded to the Hustons in the final judgment by offsetting the total fees it determined were recoverable by the Hustons by the total fees it determined were recoverable by the lot owners.

20

following categories: 1) the 362nd District Court's prior rulings on ownership, control, and maintenance fees—via the agreed judgment incorporating the Settlement Agreement—precluded the trial court from relitigating the same issues under principles of res judicata or collateral estopppel; 2) there is no evidence to support appellees' breach of contract, quantum meruit, or common law debt claims; 3) the airstrip easements are irrelevant and do not control; 4) the lot owners never agreed to pay fees unrelated to maintenance of the airstrip; 5) any maintenance fees that are chargeable are owed to the Association and not to the Hustons or their successors; 6) Ben, Jr., Diana, Wes, and Cristy did not assume any obligation to maintain the runway when Ben and Mary conveyed the airstrip to them, nor did they contract with Ben and Mary to do so; 7) FAA regulations provide only for the imposition of a uniform landing fee, which has never existed; thus, any maintenance fee should be for the whole subdivision to be assessed by the Association only; 8) the trial court improperly calculated prejudgment interest; and 9) the trial court should have made additional findings of fact and conclusions of law requested by appellants. Appellants also contend that if we reverse any substantive rulings in favor of the Hustons, we should also remand the attorneys' fees part of the judgment to the trial court for a new trial.

In their cross-appeal, the Hustons contend (1) that the trial court erred by entering a declaratory judgment that they could not withhold access under the easements if the lot owners were not current in their payment of fees and (2) that the trial court erred by awarding attorneys' fees to the lot owners, which it offset against the fees recovered by the Hustons.

**Summary Judgment Standard of Review**

When both parties move for summary judgment and the trial court grants one motion and denies the other, the reviewing court should review both parties' summary judgment evidence and determine all questions presented. *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005). The reviewing court should render the judgment that the trial court should have rendered. *Id*.

A plaintiff is entitled to summary judgment on a cause of action if it conclusively proves all essential elements of the claim. *See* TEX. R. CIV. P. 166a(a), (c); *MMP, Ltd. v. Jones*, 710 S.W.2d 59, 60 (Tex. 1986). A defendant who conclusively negates at least one essential element of a cause of action is entitled to summary judgment on that claim. *IHS Cedars Treatment Ctr. of Desoto, Tex., Inc. v. Mason*, 143 S.W.3d 794, 798 (Tex. 2004); *see* TEX. R. CIV. P. 166a(b), (c).

22

When reviewing a summary judgment, we take as true all evidence favorable to the nonmovant, and we indulge every reasonable inference and resolve any doubts in the nonmovant's favor. *Mason*, 143 S.W.3d at 798. Questions of law are appropriate matters for summary judgment. *Rhone-Poulenc, Inc. v. Steel*, 997 S.W.2d 217, 223 (Tex. 1999); *Westchester Fire Ins. Co. v. Admiral Ins. Co.*, 152 S.W.3d 172, 178 (Tex. App.—Fort Worth 2004, pet. filed) (op. on reh'g).

### Findings of Fact and Conclusions of Law

Appellants contend that they were entitled to findings of fact and conclusions of law as to all of the trial court's rulings, including the rulings in its order granting partial summary judgment. The trial court issued findings of fact and conclusions of law on the only issue that proceeded to trial—whether the parties were entitled to attorneys' fees and litigation costs. The trial court refused to make findings of fact and conclusions of law on the issues determined by summary judgment.

When a trial court grants summary judgment relief, findings of fact have no place in the proceeding because the summary judgment proceeding has not been "tried" within the scope of rule 296, the rule of civil procedure authorizing findings of fact and conclusions of law. *Linwood v. NCNB Tex.*, 885 S.W.2d 102, 103 (Tex. 1994); *Homes v. Cull*, 173 S.W.3d 565, 575 (Tex. App.—Fort

23

Worth 2005, no pet.); *see also* TEX. R. CIV. P. 296-98.  The failure to make such findings is not error and, if made, they are correctly disregarded by the appellate court.  *Cotton v. Ratholes, Inc*., 699 S.W.2d 203, 204 (Tex. 1985).

Nevertheless, appellants contend that because the trial court later incorporated its partial summary judgment rulings into a final judgment, part of which included rulings made by the trial court after a partial trial on the merits, it is now unclear whether the summary judgment rulings are now to be "regarded as resulting from a full trial."  But appellants have provided us with no authority supporting this contention, nor have we found any.  *See, e.g., Pantaze v. Yudin*, 229 S.W.3d 548, 550-51 (Tex. App.—Dallas 2007, pet. dism'd w.o.j.) (reviewing partial summary judgment incorporated into final judgment under applicable summary judgment standard of review).  Thus, we conclude and hold that appellants were not entitled to any additional findings of fact and conclusions of law in this case, and the trial court did not err by refusing to make the additional ones requested by appellants.  *Cf. Main Place Custom Homes, Inc. v. Honaker*, 192 S.W.3d 604, 612 (Tex. App.—Fort Worth 2006, pet. denied) ("If the refusal to file additional findings does not prevent a party from adequately presenting an argument on appeal, there is no reversible error.").

**No Evidence on Breach of Contract, Quantum Meruit,**

24

**or Common Law Debt Claims**

Appellants contend that the Hustons abandoned their claims for breach of contract, quantum meruit, and common law debt and that, consequently, there are no pled theories supporting the part of the trial court's final judgment awarding the Hustons damages in the amount of the unpaid fees. The Hustons contend that the contracts upon which their claims were based are the runway easements that they granted to the lot owners.

In appellees' First Amended Answer to Plaintiff's Fourth Amended Original Petition, Counterclaim, and Third Party Petition—appellees' latest pleading on file before the trial court granted partial summary judgment—appellees stated that they "seek and are entitled to recover unpaid fees related to the runway easements from" appellants, under the heading, "Claim–Breach of Contract/Suit for Unpaid Fees/Quantum Meruit." In their motion for summary judgment, they stated that they are entitled to "unpaid fees plainly due and owing pursuant to written instruments authorizing [the lot owners'] use of the airports [sic]." It is clear from appellees' pleadings and their motion for summary judgment that they were seeking damages for the lot owners' failure to pay  fees in accordance with the runway easements and the "subject to" language that was included in each one.

25

Appellants allege that the "subject to" language in the easements is no evidence that the lot owners have an obligation to pay such fees. Specifically, they contend that the language is ambiguous and can be interpreted in more than one reasonable way. For instance, they contend that the easements could be construed to require "each lot owner . . . to pick up his/her fair share of the cost of maintaining" the airstrip.

**Applicable Law**

The rules of contract construction govern the interpretation of easements. *Marcus Cable Assocs., L.P. v. Krohn*, 90 S.W.3d 697, 700 (Tex. 2002); *DeWitt County Elec. Coop., Inc. v. Parks*, 1 S.W.3d 96, 100 (Tex. 1999); *Hubert v. Davis*, 170 S.W.3d 706, 711 (Tex. App.—Tyler 2005, no pet.). Courts must examine the easement as a whole in light of the circumstances present when the parties entered the agreement. *DeWitt*, 1 S.W.3d at 101; *Koelsch v. Indus. Gas Supply Corp.*, 132 S.W.3d 494, 497-98 (Tex. App.—Houston [1st Dist.] 2004, pet. denied).

The contracting parties' intentions, as expressed in the easement grant, determine the scope of the conveyed interest. *Marcus Cable*, 90 S.W.3d at 700-01; *DeWitt*, 1 S.W.3d at 103; *Koelsch*, 132 S.W.3d at 497-98. Unless the language is ambiguous, we rely solely on the written instrument. *Koelsch*, 132 S.W.3d at 498. Like a contract, an easement is unambiguous as a matter

26

of law if it can be given a definite or certain legal meaning. *Hubert*, 170 S.W.3d at 711; *see J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 229 (Tex. 2003); *Heil Co. v. Polar Corp*., 191 S.W.3d 805, 810 (Tex. App.—Fort Worth 2006, pet. denied). On the other hand, if an easement is susceptible to more than one reasonable interpretation, it is ambiguous. *Hubert*, 170 S.W.3d at 711; *see Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983); *Heil*, 191 S.W.3d at 810.

Words used in an unambiguous contract are given their plain and ordinary meanings unless the instrument shows that the parties used the words in a technical or different sense. *Heil*, 191 S.W.3d at 810. We assume that the parties intend for every clause to have some effect. *Koelsch*, 132 S.W.3d at 498; *Eastman Software, Inc. v. Tex. Comm. Bank, N.A*., 28 S.W.3d 79, 85 (Tex. App.—Texarkana 2000, pet. denied); *see also NP Anderson Cotton Exchange, L.P. v. Potter*, 230 S.W.3d 457, 463 (Tex. App.—Fort Worth 2007, no pet.) (construing lease). When the provisions of a contract appear to conflict, we harmonize them, if possible, to reflect the intentions of the parties. *Ogden v. Dickinson State Bank*, 662 S.W.2d 330, 332 (Tex. 1983); *Koelsch*, 132 S.W.3d at 498. To achieve this objective, we examine and consider the entire contract to harmonize and give effect to all its provisions, so that none

will be rendered meaningless. *NP Anderson*, 230 S.W.3d at 463; *Koelsch*, 132 S.W.3d at 498.

We review the trial court's interpretation of an easement de novo. *Hubert*, 170 S.W.3d at 711; *Air Park-Dallas Zoning Comm. v. Crow-Billingsley Airpark, Ltd*., 109 S.W.3d 900, 909 (Tex. App.—Dallas 2003, no pet.).

A grantee of property rights who accepts delivery of a conveyance is bound by the conditions and obligations contained within the conveying instrument regardless of whether the grantee actually signs the conveyance instrument. *See Greene v. White*, 153 S.W.2d 575, 583 (Tex. 1941); *Panhandle Baptist Found., Inc. v. Clodfelter*, 54 S.W.3d 66, 72 (Tex. App.—Amarillo 2001, no pet.) (applying rule to easement); *Rutten v. Cazey*, 734 S.W.2d 752, 755 (Tex. App.—Waco 1987, writ denied) (same). The recording of a conveyance creates a presumption of acceptance. *Panhandle Baptist Found*., 54 S.W.3d at 71-2.

With respect to a conveyance of an interest in real property, the term "subject to" is a term of qualification, meaning "subordinate to," "subservient to," or "limited by." *EOG Res., Inc. v. Hanson Prod. Co*., 94 S.W.3d 697, 702 n.2 (Tex. App.—San Antonio 2002, no pet.); *Bradshaw v. Lower Colo. River Auth*., 573 S.W.2d 880, 883 (Tex. Civ. App.—Beaumont 1978, no writ); *Kokernot v. Caldwell*, 231 S.W.2d 528, 531 (Tex. Civ. App.—Dallas 1950, writ

28

ref'd). Because "subject to" language implies a limitation, it should not be interpreted to give a grantee rights in addition to an already stated scope of conveyance. Rather, an easement that is granted "subject to" certain conditions—including conditions requiring performance by the grantee—is burdened by those conditions. *See Rutten*, 734 S.W.2d at 755 (holding that easement grantee was required to build and maintain fence over easement when easement grant was expressly made subject to affirmative obligation of grantee to build and maintain fence); *see also Kuo v. Greenview Townhomes Ass'n, Inc*., No. B14-88-00066-CV, 1989 WL 6925, at *1–2 (Tex. App.—Houston [14th Dist.] Feb. 2, 1989, no writ) (not designated for publication) (holding, in accordance with cases construing "subject to" language as language of limitation, that grantee of deed made subject to "maintenance charges not now due and the leans [sic] securing said charges" was personally liable for payment of such maintenance charges).

**Analysis**

The trial court concluded that the owner of the airstrip is entitled to charge the fee set forth in the easements, that the owner may increase the fee by ten percent each year as provided for in the easements, that the fees are not subject to a reasonableness limitation, and that the owner is not obligated to account for or segregate any payments for the fees from other funds.

29

The easements are not ambiguous; thus, we rely solely on the easements themselves to interpret their meaning. Each easement, on its face, clearly provides that the owner of the lot, and his or her successors or assigns, is entitled to nonexclusive use of the airstrip for flight and taxiway purposes. Immediately following the granting language and the property description, the easement states that the grant is subject to certain enumerated conditions regarding use of the airstrip. Thus, the discernable intent of the parties is that use of the airstrip is to be in compliance with the enumerated terms and conditions.

Within these terms and conditions, the language establishing the charge "for use of airport" is likewise not ambiguous. It includes an affirmative obligation of grantee: "Grantee shall pay any such charge within 30 days from date of billing." It also sets a floor for the fee amount, $200 per year, and provides that either the owner or the manager of the airstrip can increase the fee by no more than ten percent each year. This is a definite formula that is easily determinable based on fees charged for the prior year. Nothing in this language provides that the fee must be reasonable or that the owner or manager of the airstrip must provide an accounting of the fees, segregate payments for the fees from any other funds, or use the fees for any particular purpose. Appellants have not pointed to any statute or case law that would

30

compel a contrary conclusion in light of the express intent of the language in the easements.

Although the "subject to" language in the easements shows an intent for a property owners' association to manage the airstrip under a lease agreement, the fee language contemplates payments to either the owner of the airstrip or the manager; this shows an intent that the airstrip might not always be managed by a property owners' association and, in the absence of a separate manager, that fees may be collected by the owner.

Appellants contend that the trial court's construction of the easements does not make sense, especially in light of the trial court's conclusion that the amount of the fees, if escalated the full ten percent each year, would eventually exceed the value of the lots themselves. But the trial court recognized that although such a situation was a future possibility, it had not yet occurred. An easement granted for a particular purpose terminates when its purpose is rendered impossible of performance, not before. *See Jones v. Fuller*, 856 S.W.2d 597, 603 (Tex. App.—Waco 1993, writ denied). The mere possibility that performance in the future may be affected by the lockstep use of the escalation clause in the easements does not mean that the unambiguous nature of the fee language can be ignored in determining the present status of the easement.

Accordingly, we hold that the easement language is not ambiguous and that the trial court properly construed the fee language.

As part of their no-evidence arguments, appellants also contend that the Settlement Agreement prohibits appellees from charging the fees expressly set forth in the easements. We will examine that contention together with appellants' contention that the Settlement Agreement has a judicially preclusive effect as to the easements.

### Settlement Agreement Pre-emption

Appellants contend that the agreed judgment in the 362nd District Court incorporating the Settlement Agreement prohibits the Hustons from charging and collecting any fees for use of the airstrip, including the fees set forth in the easement agreements.

**Applicable Law**

As with easements, agreed judgments should be construed in the same manner as contracts. *Gulf Ins. Co. v. Burns Motors, Inc.*, 22 S.W.3d 417, 422 (Tex. 2000); *Ferguson v. Ferguson*, 111 S.W.3d 589, 594 (Tex. App.—Fort Worth 2003, pet. denied). Thus, we begin with an examination of the language of the Settlement Agreement, which is the basis of the agreed judgment. *See Columbia Gas Transmission Corp. v. New Ulm Gas, Ltd.*, 940 S.W.2d 587, 588 (Tex. 1996)*; Ferguson*, 111 S.W.3d at 592. We also look to the other

32

documents entered into by the parties as part of the same transaction; here, those documents are the lease and the easement to the bank for Lot 1, Block B. *DeWitt*, 1 S.W.3d at 101-02; *see NP Anderson*, 230 S.W.3d at 463.

Res judicata applies to an agreed judgment. *St. Raphael Med. Clinic, Inc. v. Mint Med. Physician Staffing, L.P.*, No. 01-06-00983-CV, 2007 WL 3105811, at *3 (Tex. App.—Houston [1st Dist.] Oct. 25, 2007, no pet.); *Jistel v. Tiffany Trail Owners Ass'n*, 215 S.W.3d 474, 480 (Tex. App.—Eastland 2006, no pet.). The doctrine of res judicata in Texas holds that a final judgment in an action bars the parties and their privies from bringing a second suit "not only on matters actually litigated, but also on causes of action or defenses which arise out of the same subject matter and which might have been litigated in the first suit." *Compania Financiara Libano, S.A. v. Simmons*, 53 S.W.3d 365, 367 (Tex. 2001); *Barr v. Resolution Trust Corp*., 837 S.W.2d 627, 630 (Tex. 1992).

The doctrine of collateral estoppel also precludes the relitigation of issues. *See Sysco Food Servs., Inc. v. Trapnell*, 890 S.W.2d 796, 801 (Tex. 1994); *Fort Worth Hotel Ltd. P'ship v. Enserch Corp*., 977 S.W.2d 746, 753 (Tex. App.—Fort Worth 1998, no pet.) (op. on reh'g). A party seeking to assert the bar of collateral estoppel must establish that (1) the facts sought to be litigated in the second action were fully and fairly litigated in the first action, (2) those

facts were essential to the judgment in the first action, and (3) the parties were cast as adversaries in the first action. *Sysco Food Servs.*, 890 S.W.2d at 801; *Fort Worth Hotel*, 977 S.W.2d at 753.

**Analysis**

The language in the Settlement Agreement that appellants contend governs the issues in this case appears immediately after the paragraph that obligates the owners of the airstrip, at that time Ben and Mary, to execute access easements in exchange for one time cash payments. The Settlement Agreement then states, "No further payments shall be due to Huston in connection with the use of the airstrip . . . or taxiways or access point."

Although this language in the Settlement Agreement appears to provide that the Hustons would not be entitled to any further payments for the easements, the easement to the bank, executed as part of the same transaction, included the same "subject to" fee language, obligating the grantee to pay an annual fee "for use of airport." These two provisions appear at first to conflict, but an examination of all the documents executed in connection with the Settlement Agreement and agreed judgment reveals the parties'

intentions regarding the management and operation of the airstrip and the access thereto.

The Settlement Agreement recitations recognize Ben and Mary's roles as initial developers of the property and describe the deed in lieu of foreclosure and subsequent dispute between Ben and Mary and the bank. When viewed as a whole, with the lease and easement to the bank, it is clear that the overall development scheme contemplated by the Settlement Agreement was that the Association would manage and be responsible for maintaining the airstrip for the benefit of the owners of lots within the subdivision only during the lease term, as that term could be extended. The lease itself provided that upon termination, the Association would surrender possession of the airstrip. Moreover, the Settlement Agreement itself provided for the possibility that the Association would not be organized, or having been organized would cease to function; the Settlement Agreement makes it clear that in that event access to the airstrip is not affected. Thus, the intent of the parties that can be ascertained from these documents is that upon either (1) expiration of the lease, whether after the initial ten years or after the renewal term, if exercised, or (2) failure or inability of the Association to assume its rights and duties as contemplated by the Settlement Agreement, responsibility for managing, operating, and maintaining the airstrip would remain with the owners of the

35

airstrip, who would nevertheless continue to provide access to the adjoining lot owners.

The lot owners accepted their easement agreements pursuant to the "subject to" fee language. All of those easements were either conveyed or ratified after the Settlement Agreement. Although the Settlement Agreement states that no further payments shall be due to Ben and Mary in connection with use of the airstrip, nothing in the Settlement Agreement *prohibits* third parties from contracting otherwise. Nothing in the record indicates that the lot owners who received their easements directly from Ben and Mary objected to the fee language; instead, it shows that they initially paid the fees, some for several years. And the lot owners who did not receive their easements directly from Ben and Mary purchased their lots subject to the already existing easements.

Thus, we hold that the trial court's judgment allowing the Hustons to recover fees from the lot owners was consistent with the proper construction of the agreed judgment and Settlement Agreement and, thus, that the Hustons' claims against the lot owners are not barred under principles of res judicata or collateral estoppel.

Appellants also contend that Smith's attempt to reinstate the Association was valid and that as a result the Association should be allowed to assume "its

rights of management" and dismiss the Hustons from the obligations they have assumed to maintain the airstrip. But as we have stated above, the Settlement Agreement contemplates that the Association will manage the airstrip only so long as the lease is effective. The initial ten year term of the lease expired May 31, 2000; to renew the lease for an additional ten years, the Association had to give the owner of the airstrip written notice no later than April 2, 2000. Even if the Association has been validly reinstated, it cannot go back and renew the lease; the time to do so has passed. The Hustons' current operation and management of the airstrip, post-termination of the lease with the Association, is consistent with the intent of the parties as expressed in the Settlement Agreement. Thus, it is irrelevant to the access and fee validity issues whether the Association was validly reinstated.

The lot owners also contend that because the airport is a general aviation (public) airport under FAA regulations, anyone can use the facilities, subject only to a uniform landing fee, which does not exist and has never existed. Appellants did not make this argument in their motion for partial summary judgment, nor did they raise it in their response to appellees' motion for summary judgment. Thus, we cannot consider it. *Johnson v. Brewer & Pritchard, P.C.,* 73 S.W.3d 193, 204 (Tex. 2002); *Sci. Spectrum, Inc. v.*

*Martinez,* 941 S.W.2d 910, 912 (Tex. 1997); *Vawter v. Garvey*, 786 S.W.2d 263, 264 (Tex. 1990).

We conclude and hold that the trial court's summary judgment rulings regarding the easement fees were not incorrect as a matter of law and that appellants did not prove their entitlement to judgment as a matter of law on those grounds.

**Prejudgment Interest**

The lot owners also contend that the trial court incorrectly calculated prejudgment interest on the damage awards to the Hustons. According to appellants, the trial court should have calculated prejudgment interest under section 302.002 of the Texas Finance Code rather than under common law principles. TEX. FIN. CODE ANN. § 302.002 (Vernon 2006).

Prejudgment interest is "compensation allowed by law as additional damages for lost use of the money due as damages during the lapse of time between the accrual of the claim and the date of judgment." *Johnson & Higgins of Tex., Inc. v. Kenneco Energy, Inc.*, 962 S.W.2d 507, 528 (Tex. 1998); *Pringle v. Moon*, 158 S.W.3d 607, 611 (Tex. App.—Fort Worth 2005, no pet.). There are two legal sources for an award of prejudgment interest: (1) general principles of equity and (2) an enabling statute. *Johnson & Higgins*, 962 S.W.2d at 528. Prejudgment interest awarded under common law should

38

conform to the statutory accrual and compounding formulas applicable to suits for wrongful death, personal injury, and property damages. *Id*. at 530-32; *De la Garza v. De la Garza*, 185 S.W.3d 924, 928 (Tex. App.—Dallas 2006, no pet.). Under that statutory accrual formula, prejudgment interest begins to accrue "on the earlier of the 180th day after the date the defendant receives written notice of a claim or the date the suit is filed." TEX. FIN. CODE ANN. § 304.104 (Vernon 2006); *De la Garza*, 185 S.W.3d at 928; *see Johnson & Higgins*, 962 S.W.2d at 531 (applying former version of section 304.104).

Section 302.002 of the finance code provides as follows:

> If a creditor has not agreed with an obligor to charge the obligor any interest, the creditor may charge and receive from the obligor legal interest at the rate of six percent a year on the principal amount of the credit extended beginning on the 30th day after the date on which the amount is due. If an obligor has agreed to pay to a creditor any compensation that constitutes interest, the obligor is considered to have agreed on the rate produced by the amount of that interest, regardless of whether that rate is stated in the agreement.

TEX. FIN. CODE ANN. § 302.002. The finance code defines a "creditor" as "a person who loans money or otherwise extends credit. The term does not include a judgment creditor." *Id*. § 301.002(a)(3). A "loan" is defined as "an advance of money that is made to or on behalf of an obligor, the principal amount of which the obligor has an obligation to the pay the creditor. The term does not include a judgment." *Id*. § 301.002(a)(10). An obligor is " a person

39

to whom money is loaned or credit is otherwise extended. The term does not include . . . a judgment debtor." *Id*. § 301.002(a)(13). A judgment creditor is "a person to whom a money judgment is payable," and a judgment debtor is "a person obligated to pay a money judgment." *Id*. § 301.002(a)(5), (6).

The lot owners' obligation to pay easement fees did not involve an extension of credit; rather, the obligation requires them to pay annual fees for the easements in advance. Thus, the Hustons are not "creditors" for purposes of section 302.002, and the lot owners are not "obligors." S*ee id*. § 301.002(a)(3), (13); *De la Garza*, 185 S.W.3d at 928. Accordingly, the calculation of prejudgment interest under section 302.002 does not apply to the Hustons' judgment against the lot owners for fees. Appellants do not explain how the trial court may have improperly calculated prejudgment interest pursuant to common law principles in the event they apply. Thus, we hold that the trial court did not err in its calculation of prejudgment interest.

We overrule both of appellants' issues.

### The Hustons' Cross-Appeal

In two issues, the Hustons contend (1) that the trial court erred by entering a declaratory judgment that they are not entitled to condition the lot owners' use of the airstrip upon their timely paying the easement fees and (2)

that the trial court should not have awarded any attorneys' fees to the lot owners pursuant to the Declaratory Judgments Act[15].

### Self-Help Remedies

The Hustons contend that the language in the easements unambiguously provides that the lot owners' use of the airstrip is conditioned upon their timely payment of the annual fees such that "the Hustons should have the right to deny use of the runway to any easement holder who is in arrears in paying those fees."

Texas law has stated that "subject to" language is a term of qualification and limits the estate granted. *Hawkins v. Ehler*, 100 S.W.3d 534, 548 (Tex. App.—Fort Worth 2003, no pet.). However, an easement is not forfeited by a grantee's failure to abide by its terms and conditions. *See Hoak v. Ferguson*, 255 S.W.2d 258, 261 (Tex. App.—Fort Worth 1953, writ ref'd n.r.e.).

The Hustons contend that they are not seeking to have the easements forfeited, only that they be allowed (without prior judicial intervention) to suspend the lot owners' right to access pursuant to the easements while any

---

[15] In their cross-appeal brief, the Hustons address the attorney's fees issue as their first issue and the self-help issue as their second. We address their issues out of order for clarity of discussion.

fees remain unpaid. According to the Hustons, the effect of the "subject to" language is to limit the lot owners' right to exercise their access rights under the easements to those times when they are in compliance with all of the "subject to" conditions.

Under general easement law, the owner of the dominant estate (here, the lot owners) has a duty to maintain the easement, and the owner of the servient estate (here, the Hustons) has no right to interfere with the rights of the dominant estate to the easement. *Reyna v. Ayco Dev. Corp.*, 788 S.W.2d 722, 724 (Tex. App.—Austin 1990, writ denied); *see also West v. Giesen*, 242 S.W. 312, 320–21 (Tex. Civ. App.—Austin 1922, writ ref'd) ("The owner of land which is subject to an easement requiring the maintenance of means for its enjoyment is not bound, unless by virtue of some agreement, to keep such means in repair, or to be at any expense to maintain them in a proper condition."). The "subject to" language, then, merely limits the scope of the general rights granted with an easement; in other words, by including "subject to" language in an easement, the parties show an intent to limit the normal rights and duties attendant with the grant of an easement.

Here, the language in the easements indicates the parties' intent to limit unrestricted access to the easement area; access is to be in accordance with airport rules and regulations, and it does not include the right to park aircraft or

42

other personal property, or to construct real property, on the easement. However, nothing in the easements addresses remedies available to the owner of the servient estate (the Hustons) in the event any lot owner fails to pay the easement fees, nor do the easements indicate that the owner of the servient estate has the right to deny the already limited access completely while fees are unpaid. Furthermore, this interpretation of the easements is consistent with the Settlement Agreement, the lease, and the easement to the bank for Lot 1, Block B, all of which were part of the same transaction; those documents make it clear that, contrary to general easement law, the owners of the servient estate were to be responsible for managing and maintaining the easements in the absence of an Association, that the lot owners' access to the airstrip was to be limited by the operation of applicable covenants, conditions, and restrictions governing use of the airstrip, but also that their already limited access was not to be further impaired by the owners of the servient estate.

The two cases cited by the Hustons, *Kuo v. Greenview Townhomes Ass'n, Inc*. and *EOG Resources, Inc. v. Hanson Production Co*., while supporting appellees' contention that by accepting the easements, the lot owners accepted the obligation to the pay the fees as set forth therein, do not stand for the proposition that appellees can, without judicial intervention, withhold the lot owners' access to the airstrip when fees are unpaid. *EOG*

*Res.,* 94 S.W.3d at 702 (employing principles of contract construction in holding that language in assignment stating that it was "subject to" letter agreement meant that assignment incorporated terms of letter agreement); *Kuo*, 1989 WL 6925, at *1 (holding that property owners' association was entitled to judgment against tenant for maintenance fees).

We conclude and hold that the trial court did not err by determining that the Hustons may not withhold access to the airstrip if the lot owners are delinquent in paying fees. We overrule the second issue in the Hustons' cross-appeal.

### Award of Attorneys' Fees to Appellants

In the first issue in their cross-appeal, the Hustons contend that the trial court abused its discretion by awarding attorneys' fees to appellants under the Declaratory Judgments Act and offsetting those fees against the fees it awarded to the Hustons under section 38.001 of the civil practice and remedies code.

The grant or denial of attorney fees in a declaratory judgment action lies within the discretion of the trial court, and its judgment will not be reversed on appeal absent a clear showing that it abused its discretion. *Oake v. Collin County*, 692 S.W.2d 454, 455 (Tex. 1985); *NP Anderson*, 230 S.W.3d at 466. Under the Declaratory Judgments Act, a court "may award costs and

44

reasonable and necessary attorney's fees as are equitable and just."  TEX. CIV. PRAC. & REM. CODE ANN. § 37.009; *NP Anderson*, 230 S.W.3d at 466; *Cotten v. Weatherford BancShares, Inc.*, 187 S.W.3d 687, 709 (Tex. App.—Fort Worth 2006, pet. denied).  "The statute . . . affords the trial court a measure of discretion in deciding whether to award attorney's fees or not" and places few restrictions on this discretion.  *Bocquet v. Herring*, 972 S.W.2d 19, 20-21 (Tex. 1998); *NP Anderson*, 230 S.W.3d at 466.  Reasonableness and necessity are fact questions; the equity and justice of the fee award are left to the trial court's discretion.  *Ridge Oil Co. v. Guinn Invs., Inc.*, 148 S.W.3d 143, 161 (Tex. 2004); *Bocquet*, 972 S.W.2d at 21; *NP Anderson*, 230 S.W.3d at 466.

"[T]he award of attorney's fees in declaratory judgment actions is clearly within the trial court's discretion and is not dependent on a finding that a party 'substantially prevailed.'"  *Barshop v. Medina County Underground Conservation Dist.*, 925 S.W.2d 618, 637 (Tex. 1996).  A party need not recover damages or even seek affirmative relief to be awarded attorneys' fees under the Declaratory Judgments Act, as long as the award of fees is equitable and just.  *Hong Kong Dev., Inc. v. Nguyen*, 229 S.W.3d 415, 452 (Tex. App.—Houston [1st Dist.] 2007, no pet.); *Save Our Springs Alliance, Inc. v. Lazy Nine Mun. Util. Dist. ex rel. Bd. of Dirs*., 198 S.W.3d 300, 318 (Tex.

45

App. — Texarkana 2006, pet. denied); *Del Valle ISD v. Lopez*, 863 S.W.2d 507, 512-13 (Tex. App. — Austin 1993, writ denied).

The Hustons contend that the trial court's award of attorneys' fees to the lot owners was not equitable and just. They claim that the primary consideration in determining whether an award of fees is equitable and just is the identity of the prevailing party.[16] According to the Hustons, not only should they have been the sole prevailing party because they should have prevailed on their contention that they could restrict the lot owners' access to the airstrip while fees remained unpaid, but also because — even if we overruled their issue as to access — they prevailed on the majority of their claims while the lot owners prevailed on only one of their claims, which was ancillary to the main issues in the case. Accordingly, the Hustons challenge not only the award of attorneys' fees to the lot owners, but the amount as well.

---

[16] The Hustons contend that "[t]he one princip[le] plainly established in [this court's opinion in] *Cotton v. Weatherford Bancshares, Inc.* is the idea that a driving force directing the exercise of discretion to award fees under the DJA is the identification of the prevailing party." However, this court's discussion in *Cotten* was in the context of explaining why a trial court's award of attorneys' fees to a party who had prevailed on some but not all of his issues was not an abuse of discretion. 187 S.W.3d at 709-10. We did not rely on such reasoning to *reverse* a trial court's award of attorneys' fees to a party who prevailed on at least one of its affirmative issues. *See id*.

46

Although the Hustons contend that the most important issue in the suit was whether and on what conditions the lot owners were required to pay fees under the easements, the lot owners' ability to access the airstrip was also a subject of much of the litigation. The lot owners obtained a temporary injunction preserving their right to access the airstrip during the litigation, and much of their motion for summary judgment was devoted to attempting to prove their entitlement to a permanent injunction. Although the trial court reserved the lot owners' claim for a permanent injunction for trial, they voluntarily nonsuited the claim, presumably in light of the trial court's ruling in their favor on the access issue.

We conclude and hold that the trial court did not abuse its discretion by determining that the lot owners should be awarded, in the words of the Hustons, "just less than one-third" of the fees they attributed to the declaratory judgment part of the case. The trial court was within its discretion to determine that the access issue was a vital part of the relief sought by the lot owners and that they were entitled to recover fees related to their work on that aspect of the case.

We overrule the first issue in the Hustons' cross-appeal.

47

**Conclusion**

Having overruled both of appellants' issues and the two issues in the

Hustons' cross-appeal, we affirm the trial court's judgment.


TERRIE LIVINGSTON
JUSTICE

PANEL B:   LIVINGSTON, WALKER, and MCCOY, JJ.

DELIVERED: March 20, 2008