CANADIAN AMERICAN ASSOCIATION OF PROFESSIONAL BASEBALL, LTD. v. OTTAWA RAPIDZ, FORMER MEMBER OF CANADIAN AMERICAN ASSOCIATION OF PROFESSIONAL BASEBALL, LTD., ROB HALL, FORMER DIRECTOR OF OTTAWA RAPIDZ, SHELAGH O'CONNOR, FORMER ALTERNATE DIRECTOR OF OTTAWA RAPIDZ, AND OTTAWA PROFESSIONAL BASEBALL, INC., AS LESSEE OF THE OTTAWA RAPIDZ, RESPONDENTS

No. COA10-758

(Filed 21 June 2011)

**1. Arbitration and Mediation— failure to move to modify or vacate arbitration award—confirmation of arbitration award proper**

The trial court did not err in a dispute concerning an arbitration agreement by granting a motion filed by petitioner Canadian American Association of Professional Baseball, Ltd. to confirm an award in an arbitration proceeding. Respondents failed to move to vacate or modify the award based on the alleged irregularity in the form of the award or pursuant to any other statutory grounds.

**2. Arbitration and Mediation— denial of motion to dismiss proper—neither respondent personally affected—no argument jurisdiction lacking**

The trial court did not err in a dispute concerning an arbitration agreement by denying respondents Hall and O'Connor's motion to dismiss for lack of personal jurisdiction and because they were not parties to the arbitration. Neither Hall nor O'Connor were personally affected in their individual capacities by the trial court's judgment and no argument was made that they were not, in fact, respondent Rapidz's Director and Alternate Director at the relevant times, or that jurisdiction over Rapidz was lacking.

Appeal by Respondents from order and judgment entered 26 March 2010 by Judge Patrice A. Hinnant in Forsyth County Superior Court. Heard in the Court of Appeals 13 January 2011.

*Hendrick Bryant & Nerhood, LLP, by Timothy Nerhood and T. Paul Hendrick, for Petitioner-Appellee.*

*Kilpatrick Stockton LLP, by Daniel R. Taylor, Jr., Adam H. Charnes, and James J. Hefferan, Jr., for Respondent-Appellants Ottawa Rapidz, Rob Hall, and Shelagh O'Connor.*

BEASLEY, Judge.

Respondents Ottawa Rapidz (Rapidz or Member), Rapidz' Former Director Rob Hall, and Former Alternate Director Shelagh O'Connor (collectively Appellants)[1] appeal from the trial court's order and judgment granting ·a motion filed by Petitioner Canadian American Association of Professional Baseball, Ltd. (the League) to confirm an award of the arbitrators in an arbitration proceeding between the League and Respondents. We affirm.

On 19 December 2008, the League filed a "Motion to Confirm Arbitration Award and for Order Directing Entry of Judgment" (Motion) in Forsyth County Superior Court against former League member Rapidz; Hall and O'Connor, as the Member's appointed representatives; and OPBI, the "Controlling Related Entity" with a leasehold interest in Rapidz prior to termination of the latter's membership. The Motion alleged that Rapidz entered into a "League Affiliation Agreement" (Affiliation Agreement) with the League on 19 May 2008, entitling Rapidz to operate a professional baseball team for play in the League during the 2008 and 2009 seasons, but, after completing one season in 2008, Director Hall announced that Rapidz would not be fielding a team for play in the 2009 season. Rapidz applied to the League for a voluntary withdrawal therefrom, and a hearing was held before the League's Board of Directors (Board) on 29 September 2008 to determine if grounds existed for the involuntary automatic termination of Rapidz' membership. The Motion further alleged that the Board, "acting as an arbitration panel pursuant to the League Agreements"—which include its Articles of Incorporation, Bylaws, the Affiliation Agreement, Regulations, and Lease of Baseball Operations-denied Rapidz' request for voluntary withdrawal and concluded, rather, that Rapidz had committed an unsanctioned withdrawal of its membership, subjecting it to automatic and immediate termination as a League member. The Board's decision dated 11 November 2008 (Decision) also indicated that the League was therefore entitled: (1) to draw down in full the $200,000 (Canadian dollars (CDN)) letter of credit Rapidz had posted with the League to be eligible for membership; and (2) to the extent that Rapidz' stadium lease was assignable, to cause the lease to be assigned to the League at its sole option.

Without the consent of OPBI, Appellants removed the case to federal court on 4 February 2009 and included a request for a determination that OPBI had been either fraudulently joined in the action or misaligned due to its interests adverse to Rapidz. The League filed a motion

1. While Ottawa Professional Baseball, Inc. (OPBI) is not a party to this appeal, the term "Respondents" used hereinafter refers collectively to Appellants and OPBI.

to remand the action to state court on 4 March 2009, and on 19 February 2010, the Middle District of North Carolina remanded the case due to Appellants' failure to obtain unanimous consent to removal. On 5 March 2010, Respondent Rapidz filed a Rule 12(b)(6) motion to dismiss, and Hall and O'Connor moved for dismissal also based on the League's failure to state a claim and for the lack of personal jurisdiction over them. Following a hearing on all motions, the trial court entered an order and judgment confirming arbitration, entering judgment in favor of the League pursuant to the arbitration award, and denying Appellants' motions to dismiss. On appeal, Appellants challenge the trial court's order and judgment based on contentions that: (1) Respondents' motions to dismiss should have been granted because there was no arbitration to confirm in the first place; (2) the arbitration award was not signed or otherwise authenticated by the arbitrators as required by the North Carolina Revised Uniform Arbitration Act (RUAA); (3) personal jurisdiction over Respondents Hall and O'Connor was lacking, and where neither was a party to the purported arbitration award, their motion to dismiss should have been granted.

Because "this appeal arises from a decision on a motion to confirm an arbitration award, we first note 'that a strong public policy supports upholding arbitration awards.' " *WMS, Inc. v. Weaver*, 166 N.C. App. 352, 357, 602 S.E.2d 706, 709 (2004) (quoting *Cyclone Roofing Co. v. David M. LaFave Co.*, 312 N.C. 224, 234, 321 S.E.2d 872, 879 (1984)). However, our public policy in favor of arbitration "does not come into play unless a court first finds that the parties entered into an enforceable agreement to arbitrate." *Evangelistic Outreach Ctr. v. General Steel Corp.*, 181 N.C. App. 723, 726, 640 S.E.2d 840, 843 (2007) (citation omitted); *see also Thompson v. Norfolk S. Ry. Co.*, 140 N.C. App. 115, 120, 535 S.E.2d 397, 400 (2000) ("While public policy favors arbitration, parties may not be compelled to arbitrate their claims unless there exists a valid agreement to arbitrate . . . ."). Reflecting this underlying principle, "[t]he question of whether a dispute is subject to arbitration is an issue for judicial determination[,] . . . reviewable *de novo* by the appellate court." *Rapset v. Buck*, 147 N.C. App. 133, 136, 554 S.E.2d 676, 678 (2001) (internal citations omitted).

I.

[1] Appellants argue that the dispute resolution mechanism set forth in the agreement between the parties, together with the League Agreements, does not constitute arbitration and that the proceeding

before the Board was not an arbitration because the dispute was not submitted to an impartial third-party. As such, Appellants contend that there was, in fact, no arbitration subject to confirmation by the trial court.

### A. Whether Arbitration was Contemplated by the Parties

The determination of "[w]hether a dispute is subject to arbitration involves a two-pronged analysis; the court must ascertain both (1) whether the parties had a valid agreement to arbitrate, and also (2) whether 'the specific dispute falls within the substantive scope of the agreement.'" *Id.* (citation omitted). Only the first prong is at issue: while Appellants do not deny there was a valid agreement between the parties that included an internal dispute resolution mechanism, they suggest that the process so described did not constitute "arbitration." Thus, their initial argumentas part of the broader contention that there was "no arbitration award to confirm"—is that the parties did not intend the agreed-upon procedure for resolving member-League disputes to be characterized as arbitration.

"Ordinarily, 'arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit.'" *Air Line Pilots Ass'n v. Miller*, 523 U.S. 866, 876, 140 L. Ed. 2d 1070, 1081 (1998); *see also Burgess v. Jim Walter Homes, Inc.*, 161 N.C. App. 488, 490-91, 588 S.E.2d 575, 577 (2003) ("The law of contracts governs the issue of whether there exists an agreement to arbitrate[,]" and "the party seeking arbitration must show that the parties mutually agreed to arbitrate their disputes."). While neither the RUAA nor the Federal Arbitration Act (FAA) provides a definition of "arbitration,"[2] this Court has described the term as "a process to privately adjudicate a final and binding settlement of disputed matters quickly and efficiently, without the costs and delays inherent in litigation." *Capps v. Virrey*, 184 N.C. App. 267, 272, 645 S.E.2d 825, 829 (2007).

In executing the Affiliation Agreement, Rapidz "agree[d] to be bound by and comply with all of the League Agreements" as a condition of membership and acknowledged that its affiliation with the League was subject thereto. The League's Bylaws are specifically included in

---

2. While not fatal to our resolution of this appeal, the trial court did not include in its order and judgment any finding as to whether the FAA applies here, and we note that "[t]his is a question of fact, which an appellate court should not initially decide." *Hobbs Staffing Servs., Inc. v. Lumbermens Mut. Cas. Co.*, 168 N.C. App. 223, 226, 606 S.E.2d 708, 711 (2005).

the League Agreements. *See* Unif. Arbitration Act § 6 cmt. 1 (2009) (Uniform Law Comment) (noting that this section governing validity of agreements to arbitration "is intended to include arbitration provisions contained in the bylaws of corporate or other associations as valid and enforceable arbitration agreements"). Appellants argue that Article 13.2 of the Bylaws, entitled "Member-League Disputes," governed this dispute between Rapidz and the League and, as reproduced below, does not contain the word "arbitration":

> Any dispute or controversy between any Member and the League arising out of the League Agreements or the breach thereof shall be heard and decided by the Board. . . . The Chairman of the Board will determine the schedule for a hearing which may be held in person or by telephone, in the Chairman's sole discretion. Rules of the hearing shall be set by the Chairman of the Board. The Commissioner and General Counsel shall act on behalf of the League. The Member may be represented by counsel. The Chairman of the Board shall conduct the hearing in the presence of the Board. The Board shall decide the dispute by majority vote. The Chairman shall be entitled to vote.

While Appellants acknowledge that "the nomenclature used is not determinative," they contend that the language outlining the dispute resolution process never refers to "arbitration" and the absence of that word "in the relevant provision of the Bylaws" suggests the proceedings before the Board did not constitute arbitration. However, several references to arbitration throughout the League Agreements, and therefore encompassed by Rapidz' Affiliation Agreement, undercut Appellants' contention.

The various documents comprising the League Agreements are replete with evidence that the Board is authorized to arbitrate disputes involving League members and that Rapidz agreed to submit any disputes over its membership to arbitration. Another Bylaw provision, under Article 2 dealing with "Membership," addresses "Withdrawal from the League." Specifically, § 2.8 distinguishing "Voluntary Withdrawal" from "Unsanctioned Withdrawal," outlines the process for seeking voluntary withdrawal,[3] and details the consequences of each. Subsection D thereof, whose heading reads "Injunctive Relief," provides:

---

3. Where any member seeks to withdraw from the League prior to the end of the term set out in its affiliation agreement, it may voluntarily do so after the completion of a season if it can prove "financial hardship" to the Board, which requires approval by ¾ of the Directors.

In the event of non-compliance by the withdrawing Member with the provisions described in this Section 2.8, the League shall have the right to seek injunctive relief from the court restraining the breach of the Affiliation Agreement and these Bylaws from a court of competent jurisdiction. This resort to the court for injunctive relief *is a specific exception to the requirements contained in these Bylaws for the **arbitration** of matters in dispute between the League and its Members. The Members agree that the decision of the Directors pursuant to a hearing conducted in accordance with Article 2 shall have the full force and effect of **binding arbitration*** and a court of competent jurisdiction shall be permitted to issue an injunction upon receipt of the decision of the Directors after a hearing. The Members, New Members, and the League direct that *the decision of the Directors after a hearing shall be entitled to the status of a decision of a validly consti-tuted **arbitration panel** to which each of the parties have sub-mitted to **final and binding arbitration**.* (emphasis added).

While Appellants argue that § 2.8(D) is not applicable because it "concerns injunctive relief and no party sought injunctive relief in connection with this dispute," they ignore several fundamental tenets of contract interpretation. Initially, headings do not supplant actual contract language and are not to be read to the exclusion of the provisions they precede. *See Doe v. Jenkins,* 144 N.C. App. 131, 135, 547 S.E.2d 124, 127 (2001) ("[A]n insured is not entitled to read only the heading and ignore the operative language of the provision itself." (internal quotation marks omitted)). Moreover, " 'a contract must be construed as a whole, considering each clause and word with reference to all other provisions and giving effect to each whenever possible.' " *Williamson v. Bullington,* 139 N.C. App. 571, 574, 534 S.E.2d 254, 256 (2000) (citation omitted); *see also Lynn v. Lynn,* —— N.C. App. ——, ——, 689 S.E.2d 198, 207 (2010) ("Since the object of construction is to ascertain the intent of the parties, the contract must be considered as an entirety. The problem is not what the separate parts mean, but what the contract means when considered as a whole." (internal quotation marks omitted)).

Where the "entire agreement" between the parties includes the Bylaws, the provisions of the Bylaws themselves must be read in reference to each other and the individual clauses of the other League Agreements to discern the parties' intent as to arbitration. Thus, we reject Appellants' suggestion that our interpretation of the dispute resolution process set out in the contract must be limited to Article

13.2 or any other component part of the entire agreement. Neither are we persuaded by their argument that "[o]ne isolated reference to 'arbitration' in Article 2.8(D) does not trump Article 13.2, which actually governed the proceedings." First, there is not only "one isolated reference" to arbitration in the League Agreements: the League's Articles of Incorporation specify that a primary purpose for organization was "*arbitration* and settlement of various disputes within the [League]"; the Affiliation Agreement specifically incorporates § 2.8(D) of the Bylaws and requires the parties to "recognize and agree that th[e] remedy to the court for injunctive relief *is in addition to the sole remedy of arbitration right as provided in the Bylaws*" (emphasis added); and a "Consent to Jurisdiction" clause in the Affiliation Agreement exposes the parties to personal jurisdiction in North Carolina "[s]ubject to the *arbitration provisions* set forth in the League Agreements." (emphasis added). Thus, the entire agreement demonstrates that the parties intended for the dispute resolution process referenced in Article 13 of the Bylaws to be arbitration.

Second, there is no "trumping" to speak of; in fact, the provisions operate harmoniously, and Appellants' contention that Article 13 governed the proceedings to the exclusion of Article 2 is misconstrued. While the hearing fell under the broader terms of Article 13 as it involved a Member-League dispute, Article 2's more specific procedure for involuntary termination hearings governed this particular type of Member-League dispute. Bylaw 2.9(A)(3) establishes that a member's failure "to field a team for play in the League during the season" or "take action reasonably necessary to operate as a going concern" are grounds for automatic, involuntary termination. The hearing process for any violation of § 2.9 is outlined by § 2.10, which requires, *inter alia*, a hearing before the Board at a special meeting. In this case, after Rapidz notified the League that it was seeking voluntary withdrawal on the basis of financial hardship, it received a "Notice of Charges for Automatic Termination of the Membership of the Ottawa Rapidz" for a hearing before the Board on 29 September 2008 in the event that its voluntary withdrawal motion was unsuccessful. The notice alleged possible violations of Bylaw 2.9A(3) as the grounds for the charges, and the Board's 11 November Decision likewise details that the hearing was held to determine whether Rapidz failed "to take action reasonably necessary to operate as a going concern" and "field a team for play in the 2009 [s]eason." The Decision also relates that Rapidz' motion for voluntary withdrawal under Article 2.8A of the Bylaws was heard before the Board but failed to receive the necessary approval, and a hearing under Article 2.10 ensued. Where "[a]ll

disinterested Directors thereafter voted to sustain the [c]harge made by the Commissioner," Rapidz' membership was automatically and immediately terminated pursuant to Article 2.11.

Thus, the hearing was "conducted in accordance with Article 2," and the provision of § 2.8(D) thereunder that such proceedings "shall have the full force and effect of binding arbitration" unquestionably applies. To the extent the hearing also proceeded under the general terms of Article 13 of the Bylaws, § 13.3 incorporates Article 2.10 and § 13.6 establishes that "[t]he dispute and appeal process provided in this Article 13 shall be the exclusive and sole remedy of all of the parties thereto" and that the Board's decision "shall be final, conclusive, and binding." Where this language clearly connotes arbitration, *see Capps*, 184 N.C. App. at 272, 645 S.E.2d at 829; where the entire agreement between the parties reveals their intent to arbitrate the type of dispute at issue in this case; and where "[a]ny uncertainty as to the scope of the arbitration clause should be resolved in favor of arbitration," *In re W.W. Jarvis & Sons*, 194 N.C. App. 799, 803, 671 S.E.2d 534, 536 (2009), the dispute resolution mechanism set forth in the League Agreements is properly referred to as arbitration.

Our conclusion is in accord with *Parke Construction Co. v. Construction Management Co.*, where our Court construed contract language very similar to the terms of the Bylaws laying out the dispute resolution procedure under the League Agreements as "simply and clearly" providing that a dispute arising thereunder "must be resolved by binding arbitration." *See Construction Co. v. Management Co.*, 37 N.C. App. 549, 553, 246 S.E.2d 564, 566 (1978) [*Parke*]. Paragraph X of the joint venture agreement in *Parke* read: "Any and all disputes of any kind under or in connection with this Agreement will be submitted to Mr. Ira Hardin for absolute and final decision." *Id.* at 551, 246 .S.E.2d at 565. While the plaintiff contended that the provision was "not an agreement to arbitrate," and although Paragraph X did not contain the word "arbitration," the Court held that the intent of the parties was ascertainable from the plain words and clear language of the contract and excluded no dispute from arbitration. *Id.* at 553-54, 246 S.E.2d at 567. Similarly, Article 13.2 of the Bylaws as further defined by Article 2—does not exclude any Member-League dispute from arbitration, and the entire agreement reveals the parties' intent that the specific dispute at issue here was to be arbitrated by the Board.

### B. Whether The Board's Role as Arbitrator was Fatal

Appellants also argue that "the proceedings before the Board did not constitute arbitration because they did not take place before an impartial, third-party arbitrator." Instead, the Board, "which consists of a representative from each League member," was the final decision-maker, and Appellants believe that "the submission of a dispute to one of the parties itself" negated any understanding that an arbitration occurred.

*Parke* again informs our analysis. There, the plaintiff contended that Paragraph X was unenforceable as violative of a "generally prevailing public policy against permitting one of the parties to a dispute to serve as the arbitrator thereof" because "Mr. Hardin was designated by the parties to be arbitrator, and he [was] the Chairman of the Board of the company that owns [Defendant] Company." *Id.* at 554-55, 246 S.E.2d at 567-68. Despite the understanding "that arbitrators not only be completely impartial but also that they have no connection with the parties or the dispute involved," the Court noted: "It is well settled that parties knowing the facts, may submit their differences to any person, whether he is interested in the matters involved or is related to one of the parties, and the award will be binding upon them." *Id.* at 555-56, 246 S.E.2d at 568 (internal quotation marks omitted). Observing that the plaintiff "had knowledge of the extent and nature of the relationship" between Defendant and Mr. Hardin at the time the agreement was executed, and where the plaintiff merely assumed that the arbitrator would not be impartial without any evidence to support its belief, this Court was "not permitted to interfere with the contractual rights of the parties when each was aware and understood the contracts it entered into." *Id.* at 557, 246 S.E.2d at 568.

Here, Article 13.2 of the Bylaws provides that "[a]ny dispute or controversy between any Member and the League arising out of the League Agreements or the breach thereof shall be heard and decided by the Board[,]" and Article 2.10 more particularly delineates said hearing before the Board for disputes involving involuntary termination. There is no indication in the record that Appellants did not know "the extent and nature of the relationship" between the members of the Board and the League. *See Id.* Moreover, Appellants do not elaborate on how the Board members could not have been or indeed were not impartial in the performance of their duties as arbitrators of the dispute. They state only that Rapidz' involuntary termination entitled the League to draw down on its $200,000 letter of credit, but the

League would have received nothing if the Board had ruled in Rapidz' favor. The Board, however, is made up of other teams' Directors—and therefore consists of Appellants' peers—who may themselves be compelled to arbitrate a similar dispute before the same panel, and it can thus also be presumed that the voting Board members would fairly safeguard each other's interests. Thus, without more than Appellants' generalized accusation, "we are not permitted to interfere with the contractual rights of the parties" where Rapidz voluntarily and willingly agreed to have the Board act as arbitrators when it joined the League. *See Id.*

## II.

[2] In the alternative, Appellants argue that "even if an arbitration occurred, the trial court erred in granting the League's Motion to confirm because the arbitration award was not signed or otherwise authenticated by the arbitrators as required by the RUAA." However, where we have concluded that the proceedings which transpired were intended to be and in fact constituted arbitration, Appellants were required to file a motion to vacate the award or a motion to modify or correct the award under both the RUAA and the FAA if it sought to challenge any of the disputable aspects thereof. *See* 9 U.S.C. §§ 10-11 (2009); N.C. Gen. Stat. §§ 1-569.23-24 (2009). Otherwise, the court properly authorized to confirm the arbitration decision must enter an order confirming the award upon a motion for confirmation by any party to the arbitration. *See* 9 U.S.C. § 9 (2009) ("If the parties in their agreement have agreed that a judgment of the court shall be entered upon the award made pursuant to the arbitration, and shall specify the court, then at any time within one year after the award is made any party to the arbitration may apply to the court so specified for an order confirming the award, and thereupon the court *must* grant such an order *unless the award is vacated, modified, or corrected* as prescribed in sections 10 and 11 of this title." (emphasis added))[4]; N.C. Gen. Stat. § 1-569.22 (2009) ("After a party to an arbitration receives notice of an award, the party may make a motion to the court for an order confirming the award. Upon motion of a party for an order confirming the award, the court *shall* issue a confirming order *unless the award is modified or corrected* pursuant to G.S. 1-569.20 or G.S. 1-569.24 or is vacated pursuant to G.S. 1-569.23." (emphasis added)).

While Appellants argue they "did not know that the League contended that the hearing was an arbitration until the League filed its

---

4. Appellants make no argument on appeal as to whether or not they conceded that confirmation of an arbitration award was proper.

Motion," they certainly knew the League considered its Decision to be an arbitration award when the Motion for confirmation was filed and served. At no time did Appellants seek to file a motion to vacate or modify by writ of certiorari or otherwise, and their motions to dismiss, even if they could be treated as motions to vacate, do not request such relief. Where Appellants did not move to vacate or modify the award based on the alleged irregularity in the form of the award or pursuant to any other statutory grounds therefor, the trial court was required to grant an order confirming the award and did so properly.

III.

Appellants' final arguments deal solely with Respondents Hall and O'Connor, who contend that the trial court erred in denying their motion to dismiss due to a lack of personal jurisdiction and because they were not parties to the arbitration. However, as found by the Middle District in remanding this case, the League's Motion to confirm names these two Respondents, who both represented Rapidz at the arbitration hearing, "solely in their representative capacities" as Director and Alternate Director respectively, of the Rapidz baseball team. *Canadian Am. Ass'n of Prof'l Baseball, Ltd. v. Ottawa Rapidz*, 686 F. Supp. 2d 579, 587 (M.D.N.C. 2010). "Because both individuals are sued in their representative capacities, therefore, their rights and liabilities in this action are derivative of the entity they represent, Ottawa Rapidz." *Id.* Where neither Hall nor O'Connor are personally affected in their individual capacities by the trial court's judgment and where they make no argument that they were not, in fact, Rapidz' Director and Alternate Director at the relevant times, or that jurisdiction over Rapidz was lacking, the trial court did not err in denying Hall and O'Connor's motion to dismiss.

Affirmed.

Judges GEER and STEPHENS concur.