

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————————

No. 02-21-00258-CV

———————————————————

PROTON PRC, LTD., Appellant

V.

ET & AS INVESTMENTS, INC., AYOUB SHOKRAVI, AND ELLIE TAJ,
Appellees

———————————————————

On Appeal from the 348th District Court
Tarrant County, Texas
Trial Court No. 348-307664-19

———————————————————

Before Kerr, Birdwell, and Womack, JJ.
Memorandum Opinion by Justice Birdwell

## MEMORANDUM OPINION

A fuel-supply company appeals a summary judgment in favor of one of its customers. At the heart of this appeal is a dispute over whether their contract required the customer to purchase a minimum of 70,000 gallons of fuel per month. We hold that the contract did not set a minimum purchase quota, and we affirm the summary judgment to that effect.

## I. BACKGROUND

In 2015, Appellee ET & AS Investments, Inc. agreed to buy a gas station from Big Score Investors, LLC. As part of the transaction, ET & AS also agreed to execute a fuel-supply contract with Appellant Proton PRC, Ltd.

In 2016, ET & AS fulfilled that requirement when it signed a fuel-supply contract with Proton (the Contract). The Contract obligated ET & AS to buy fuel exclusively from Proton for a period of 180 months.

ET & AS operated the gas station for three years. There was evidence that during that time, ET & AS sold between roughly 42,000 and 65,000 gallons of fuel per month, with all the fuel provided by Proton. Proton accepted payment for these quantities without objection, and it never asserted that these quantities did not meet the minimum requirements of the Contract.

ET & AS agreed to sell the gas station in 2019, and per the terms of the Contract, the sale terminated the Contract. Proton filed this lawsuit shortly thereafter.

The case initially involved several claims, but through summary disposition, the suit was winnowed down to just one cause of action that is relevant to this appeal: Proton's claim that ET & AS and its principals Ellie Taj and Ayoub Shokravi breached the Contract. Proton asserted that the Contract required ET & AS to buy a minimum of 70,000 gallons of fuel from Proton per month. According to Proton, ET & AS breached this requirement both by failing to meet this quota in the past and by terminating the Contract, ensuring the quota would not be met in the future.

ET & AS and its principals moved for partial summary judgment on Proton's contract claim, arguing that the Contract did not obligate ET & AS to purchase 70,000 gallons per month. Proton also moved for summary judgment, arguing that the Contract did set a minimum quota and that a survival clause ensured that the quota endured the termination of the Contract.

The trial court denied Proton's motion and granted ET & AS's motion. The court set out the following findings in its order for partial summary judgment: "(1) the Motor Fuel Supply Contract did not require ET & AS Investments, Inc. to purchase 70,000 gallons of gasoline per month; (2) the Motor Fuel Supply Contract terminated upon the sale of the Hall Johnson Property; and (3) ET & AS Investments, Inc. is not liable to Proton PRC, Ltd. for future damages after May 23, 2019, which is the closing date for the sale of the Hall Johnson Property." The trial court then rendered a final judgment that, in pertinent part, disposed of Proton's claims and awarded ET & AS

attorney's fees. Proton requested further findings of fact and conclusions of law, but the trial court declined to render any. Proton appeals.

## II.  SUMMARY JUDGMENT STANDARD

"We review summary judgments de novo." *BPX Operating Co. v. Strickhausen*, 629 S.W.3d 189, 195 (Tex. 2021). In doing so, we take as true all evidence favorable to the nonmovant and indulge every reasonable inference and resolve any doubts in the nonmovant's favor. *Id.* at 196. "Summary judgment is proper when no genuine issues of material fact exist and the movant is entitled to judgment as a matter of law." *Id.* "When the parties file competing summary judgment motions and the trial court grants one and denies the other, we consider the summary judgment evidence presented by both sides, determine all questions presented, and if the trial court erred, render the judgment the trial court should have rendered." *Id.* (cleaned up). A defendant may obtain summary judgment by conclusively negating at least one element of the plaintiff's claim. *Murphy Expl. & Prod. Co.–USA v. Adams*, 560 S.W.3d 105, 108 (Tex. 2018).

## III.  THE BRIEFING WAS ADEQUATE

As an initial matter, ET & AS argues that Proton's arguments are inadequately briefed. We disagree.

Briefs must be liberally, but reasonably, construed so that the right to appeal is not lost by waiver. *Lion Copolymer Holdings, LLC v. Lion Polymers, LLC*, 614 S.W.3d 729, 732 (Tex. 2020). Courts should hesitate to resolve cases based on procedural defects and instead endeavor to resolve cases on the merits. *Id.* "The Texas Rules of Appellate

4

Procedure require that a brief 'contain a clear and concise argument for the contentions made, with appropriate citations to authorities and to the record.'" *In re P.S.*, 505 S.W.3d 106, 111 (Tex. App.—Fort Worth 2016, no pet.) (quoting Tex. R. App. P. 38.1(i)).

While deeply flawed,[1] Proton's brief fulfills these basic requirements. The brief included a table of contents, an index of authorities, and proper statements of the case and the facts. *See* Tex. R. App. P. 38.1. It referred to specific portions of the summary judgment record to support the factual assertions made. The brief set out arguments, and it cited some authority in support of those arguments, including multiple cases and some secondary sources. We conclude that Proton adequately briefed its arguments.

## IV.   FINDINGS AND CONCLUSION HAVE NO PLACE IN SUMMARY JUDGMENT PRACTICE

Proton first argues that the trial court erred by refusing to render further findings of fact and conclusions of law. We disagree.

Findings of fact and conclusions of law have no place in a summary judgment proceeding. *See Smith v. Huston*, 251 S.W.3d 808, 821 (Tex. App.—Fort Worth 2008, pet. denied). The trial court should not make, and the appellate court cannot consider, findings of fact and conclusions of law in connection with a summary judgment. *Schmitz v. Denton Cnty. Cowboy Church*, 550 S.W.3d 342, 352 (Tex. App.—Fort Worth 2018, pet.

---

[1]For instance, it is difficult to discern what, exactly, Proton's appellate issues are because Proton has simply recited the trial court's findings against Proton as its assigned issues.

denied) (mem. op. on reh'g). The failure to make findings and conclusions is not error, and, if made, they are correctly disregarded by the appellate court. *Smith*, 251 S.W.3d at 821.

The trial court did not err by declining to render further findings of fact and conclusions of law.

## V. THE CONTRACT DID NOT OBLIGATE ET & AS TO PURCHASE 70,000 GALLONS OF FUEL PER MONTH

Proton next challenges the trial court's determination that the Contract did not require ET & AS to purchase at least 70,000 gallons of fuel from Proton per month. Proton asserts that this determination is unsustainable because the plain language of the Contract sets a minimum quota for ET & AS's monthly purchases of fuel.

The interpretation of an unambiguous contract is a question of law for the court. *Farmers Grp., Inc. v. Geter*, 620 S.W.3d 702, 709 (Tex. 2021). Generally, we give terms their plain, ordinary, and generally accepted meaning unless the instrument shows that the parties used them in a technical or different sense. *Id.* "When construing a contract, the court's primary concern is to give effect to the written expression of the parties' intent." *Sundown Energy LP v. HJSA No. 3, LP*, 622 S.W.3d 884, 888 (Tex. 2021). "Words must be construed in the context in which they are used, but courts cannot interpret a contract to ignore clearly defined terms." *Id.* (cleaned up). We avoid construing contracts in a way that renders contract language meaningless. *Id.*

A contract for the sale of movable goods is governed by Article 2 of the Uniform Commercial Code (UCC), as codified in Chapter 2 of the Texas Business and Commerce Code. *Jonibach Mgmt. Tr. v. Wartburg Enters., Inc.*, 136 F. Supp. 3d 792, 809 (S.D. Tex. 2015). A contract for the sale of oil or natural gas is a contract for the sale of goods under the UCC. *Aquila Sw. Pipeline, Inc. v. Harmony Expl., Inc.*, 48 S.W.3d 225, 234 (Tex. App.—San Antonio 2001, pet. denied); *Howell Crude Oil Co. v. Tana Oil & Gas Corp.*, 860 S.W.2d 634, 637 (Tex. App.—Corpus Christi–Edinburg 1993, no writ). The elements of a breach of contract claim are (1) the existence of a valid contract, (2) performance or tendered performance by the plaintiff, (3) breach of the contract by the defendant, and (4) resulting damages to the plaintiff. *Old Am. Ins. Co. v. Lincoln Factoring, LLC*, 571 S.W.3d 271, 282 (Tex. App.—Fort Worth 2018, no pet.); *Rice v. Metro. Life Ins. Co.*, 324 S.W.3d 660, 666 (Tex. App.—Fort Worth 2010, no pet.).

According to Proton, the Contract obligates ET & AS to purchase a minimum monthly quota of fuel, and the Contract does so chiefly through its definition of the term "Quantities," which reads as follows:

| (g) | QUANTITIES: | Product | Minimum/Month |
| --- | --- | --- | --- |
| | | Gasoline | 70,000 gallons |

We agree that this definition refers to a "Minimum" of "70,000 gallons" and the timeframe of a "Month." But there is nothing in this definition that clarifies whom this minimum obligation is meant to fall upon, the purchaser or the supplier. In the absence

of any such clarification, this definition could just as easily be read as a term that, if it required anything it all, required Proton to *supply* a minimum quantity of gasoline each month.

The surrounding context and the way that this defined term is deployed in the Contract confirm that this latter interpretation is the only reasonable one. *See Sundown Energy*, 622 S.W.3d at 888. Within the Contract, the defined term "Quantities" is generally not used in operative provisions that create an obligation for ET & AS to purchase fuel, as might have suited Proton's interpretation. Rather, the term is generally used in provisions that deal with and limit Proton's obligation to supply fuel to ET & AS. The defined term "Quantities" is first used in the Contract's operative language in a provision titled "Deliveries."[2] The thrust of this provision is to specify and limit

---

[2]The provision reads as follows:

> Subject to the terms, provisions, and conditions hereof, Motor Fuel Products shall be delivered by Seller to Buyer at the Premises in the *quantities* ordered by Buyer. Seller shall not be required to make single deliveries of motor fuel in *quantities* of less than full transport loads unless a smaller minimum *quantity* is specified in Paragraph 1, (g). Seller may make deliveries to the Premises on any day of the week and at any time of the day or night and shall have the right to schedule deliveries at specific intervals. Buyer agrees to receive deliveries of Motor Fuel Products and to assist Seller's agent or employee in unloading same, if needed. Any excess unloading time caused by Buyer's failure to assist Seller's agent or employee shall be charged to and paid by Buyer on demand by Seller at the customary hourly rate charged by Seller. No claim by Buyer on account of shortage or quality of Motor Fuel Products shall be allowed unless Seller is first given notice by Buyer in strict accordance with Paragraph 14. [Emphasis added.]

8

Proton's obligation to deliver fuel, not to establish ET & AS's obligation to purchase it. The term "Quantities" is next used under the heading "Determination of Quantity and Quality."[3] This provision is designed to set limits on Proton's exposure to disputes over the amount of fuel that it supplied. It does not deal with disputes over the amount that ET & AS has purchased, as would have supported Proton's proposed interpretation. The term "Quantities" is also used in a provision titled "Excess Quantities,"[4] but that provision is designed to limit Proton's obligation to supply greater-than-usual amounts of fuel, not to ensure that ET & AS is purchasing a minimum amount. The way that the parties put this defined term to work in the operative portions of the Contract—as a term that relates to Proton's obligation to

---

[3]The provision reads as follows:

The *quantity* and quality of Motor Fuel Products sold hereunder shall be for all purposes conclusively deemed to be the *quantity* and quality set forth in Seller's document of delivery unless within two (2) days of the date of delivery Buyer delivers to Seller written notice of any claimed shortage in *quantity* or claimed deviation in quality. [Emphasis added.]

[4]The provision reads as follows:

In the event Seller should actually deliver to Buyer and Buyer should actually accept and receive during the Contract Term hereof *quantities* of Motor Fuel Products in excess of the maximum *quantities* herein provided, Buyer agrees to pay for said Motor Fuel Products at the prices and in the method herein provided. It is expressly understood that any purchase of excess *quantities* shall not obligate Seller to provide such excess *quantities* to Buyer on a continuing basis. Buyer waives any rights to additional *quantities* as may arise by course of dealing, operation of law or otherwise from the purchase of such excess quantities. [Emphasis added.]

9

supply fuel rather than ET & AS's obligation to buy it—strongly suggests that the term "Quantities" was not intended to effect a minimum purchase obligation.

The only time that "Quantities" is positioned in a context that deals with ET & AS's obligation to purchase fuel is in a provision that has the defined term as its title. The provision reads as follows:

> **5.      Quantities:**
>
> (a) Subject to the terms, provisions, and conditions hereof, during the Contract Term, Seller agrees to sell and deliver to Buyer all Motor Fuel Products sold at or from the Premises, and Buyer agrees to purchase from, receive and pay Seller for all Motor Fuel Products sold at or from the Premises.  Buyer further agrees to use all reasonable efforts to maximize the sale of Motor Fuel Products at the Premises during the Contract Term.

The defined term "Quantities" is absent from the operative terms of this provision; it appears solely as the provision's title.

The question presented is this: does the title of this provision, by itself, override the absence of the defined term from the operative language of the provision and arguably create a defined minimum for purchases?  That is, does the title create an overlay that so shades the meaning of the operative language that follows, such that it obligates ET & AS to purchase 70,000 gallons per month? We think the only reasonable interpretation is that it does not.

To be sure, "the title, like every other portion of a contract, may be looked to in determining its meaning . . . because headings and titles provide context and can inform the meaning of the sections they label."  *RSUI Indem. Co. v. The Lynd Co.*, 466 S.W.3d

113, 121 (Tex. 2015) (cleaned up). "Nevertheless, although courts may consider the title of a contract provision or section to interpret a contract, the greater weight must be given to the operative contractual clauses of the agreement." *Id.* (cleaned up). "Thus, titles and headings are not determinative . . . ." *Id.*

Rather, "the plain meaning of the agreement's operative language" is "the most important consideration in interpreting any contract." *Endeavor Energy Res., L.P. v. Energen Res. Corp.*, 615 S.W.3d 144, 149 (Tex. 2020) (cleaned up). Operative language is language "that gives effect to the transaction involved," *Edwards v. Doe*, 331 F. App'x 563, 572 n.15 (10th Cir. 2009) (quoting *Operative*, Black's Law Dictionary (7th ed. 1999)), and operative words are those "words that actually effect the transaction." *Operative Words*, Black's Law Dictionary (11th ed. 2019).

Strikingly absent from the operative language of this provision is anything that would obligate ET & AS to purchase "Quantities" of fuel, and thus arguably obligate ET & AS to purchase the defined minimum of 70,000 gallons of gasoline per month. Instead, as we read it, the operative language of this provision simply requires ET & AS to purchase all of the fuel for the gas station from Proton, and it reciprocally requires Proton to supply all of the fuel that ET & AS sold at the gas station—whatever the amount. Indeed, the requirement that ET & AS "use all reasonable efforts to maximize the sale" of Proton fuel products strongly suggests the absence of a minimum purchase quota, which would arguably obviate the need for maximization efforts. The heading

11

of the provision simply does not create a minimum purchase obligation that is unmoored from these operative terms.

When one federal court was faced with an analogous situation, in which the heading of a provision contained a defined term, but nothing in the provision's operative language showed that the defined term was meant to embody the parties' intent in effecting the transaction, the court took a path similar to the one we follow today. *See Gee v. Delta Speir Plantation LLC*, No. 9:18-CV-02755-DCN, 2020 WL 4674150, at *5 (D.S.C. June 11, 2020). In *Gee*, a contract included a clause that entitled the plaintiff–consultants to a portion of certain tax savings:

> b. <u>Profits from Tax Savings.</u> Company or its principal may realize certain tax savings as a result of the donation of 100 acres of Delta Bluffs to Savannah College of Art and Design. Consultants shall be entitled to twenty-percent (20%) of such savings, once the risk of a federal or state tax audit has expired, which is expected to occur in October 2016.

*Id.* The defendant agreed that under this clause, the plaintiffs were entitled to 20% of the tax savings in question. *Id.* However, the defendant noted that the clause's title was "Profits from Tax Savings," and "Profits" was a defined term in the contract. *Id.* The defendant argued that the use of this defined term in the title had the effect of importing into the clause the meaning of the defined term: that costs should be deducted from the plaintiffs' cut of the tax savings. *Id.*

The district court disagreed. *Id.* It concluded that because the defined term "Profits" did not appear in the tax savings clause outside of the heading, the amount owed to plaintiffs was 20% of the tax savings without any prior deductions. *Id.* "North

12

Carolina courts are quite clear that 'headings do not supplant actual contract language and are not to be read to the exclusion of the provisions they precede.'" *Id.* (quoting *Can. Am. Ass'n of Prof'l Baseball, Ltd. v. Ottawa Rapidz*, 711 S.E.2d 834, 838 (N.C. Ct. App. 2011)). A party "is not entitled to read only the heading and ignore the operative language of the provision itself." *Id.*

We are confident that Texas's rules of construction must lead to the same conclusion as in *Gee*: the use of the defined term "Quantities" in the heading does not override the complete absence of that term in the operative language that follows. *Cf. Enter. Leasing Co. of Hous. v. Barrios*, 156 S.W.3d 547, 549–50 (Tex. 2004). Nothing about the operative language of this provision would obligate ET & AS to purchase a minimum amount of fuel per month, and those operative terms take primacy in our reading of the Contract. *See Endeavor Energy*, 615 S.W.3d at 149.

That reading is reinforced by the parties' course of performance during the short lifespan of the Contract. When, as in this case, a contract is governed by the UCC, the terms of the contract may be explained or supplemented, without regard to the question of ambiguity, by course of performance, course of dealing, or usage of trade. *New Bremen Corp. v. Columbia Gas Transmission Corp.*, 913 F. Supp. 985, 990–91 (S.D. Tex. 1995), *aff'd*, 108 F.3d 332 (5th Cir. 1997); *see* Tex. Bus. & Com. Code Ann. § 2.202(1); *Anadarko Petro. Corp. v. Williams Alaska Petro., Inc.*, 737 F.3d 966, 970 (5th Cir. 2013) (op. on reh'g). "We construe the express terms of an agreement, where reasonable, to be consistent with the applicable course of performance." *Anadarko Petro.*, 737 F.3d at 971

13

(citing Tex. Bus. & Com. Code Ann. §§ 1.303(e), 2.202). "'[C]ourse of performance' refers to a sequence of conduct between the parties to a particular transaction that takes place during the performance of the contract at issue, meaning that a course of performance occurs after contract formation." *Driveline Retail Merch., Inc. v. PepsiCo, Inc.*, No. 4:17-CV-00423, 2018 WL 2298386, at *5 (E.D. Tex. May 21, 2018) (mem. op.) (cleaned up); *see* Tex. Bus. & Com. Code Ann. § 1.303(a). "[W]here an agreement involves repeated occasions for performance by either party with knowledge of the nature of the performance and opportunity for objection to it by the other, any course of performance accepted or acquiesced in without objection is given great weight in the interpretation of the agreement." *Driveline Retail*, 2018 WL 2298386, at *6 (quoting Restatement (Second) of Contracts § 202(4) (1981)). "The parties to an agreement know best what they meant, and their action under it is often the strongest evidence of their meaning." *Id.* (quoting Restatement (Second) of Contracts § 202 cmt. g (1981)).

There was evidence that while the Contract was in force, ET & AS never purchased 70,000 gallons of fuel in a given month. ET & AS's monthly purchases ranged from just over 42,000 gallons to just over 64,000 gallons, but never as much as 70,000. Proton fulfilled this sequence of orders each month for three years without objection. This course of performance confirms that there is only one reasonable interpretation of the Contract, and it is not Proton's. *See Anadarko Petro.*, 737 F.3d at 971 (relying on course of performance to confirm the most reasonable reading of a contract for summary judgment purposes).

14

This course of performance implicates another reason to reject Proton's proposed interpretation: it is at odds with the commercial needs that underlaid the Contract. "We construe contracts from a utilitarian standpoint bearing in mind the particular business activity sought to be served[] and avoiding unreasonable constructions when possible and proper." *N. Shore Energy, L.L.C. v. Harkins*, 501 S.W.3d 598, 602 (Tex. 2016) (cleaned up). It would serve legitimate business ends for the Contract to guarantee a minimum supply of fuel so that ET & AS, at its option, could purchase fuel at rates that its tanks and the market could bear. But it would make little sense for the Contract to mandate minimum purchases in excess of what ET & AS was able to sell or, worse yet, to store.

As a matter of law, then, the Contract does not require ET & AS to purchase a minimum quantity of fuel each month. The trial court therefore properly granted summary judgment on Proton's breach of contract claim, which is premised on the notion that the Contract required a minimum purchase amount.[5] *See Murphy Expl.*, 560 S.W.3d at 108.

## VI. THE TRIAL COURT PROPERLY EXERCISED JURISDICTION OVER TAJ AND SHOKRAVI

Lastly, Proton argues that the trial court lacked personal jurisdiction over Taj and Shokravi, such that it could not bind them to a final judgment. Proton observes that

---

[5]Because there was no minimum obligation for purchases, we need not consider Proton's arguments concerning whether such an obligation survived the Contract's termination.

Taj and Shokravi were not personally served and did not make an appearance in the early stages of the case. According to Proton, this failure to appear should preclude the trial court from rendering judgment in Taj and Shokravi's favor.

ET & AS responds that Taj and Shokravi made a general appearance when they filed a motion for summary judgment on the merits, which should clear any hurdles with respect to personal jurisdiction. We agree with ET & AS.

The purpose of citation is to give the court proper jurisdiction over the parties and to provide notice to the defendant that he has been sued, and by whom and for what, so that due process will be served and he will have an opportunity to appear and defend the action. *Bello v. Tarrant Cnty.*, No. 02-09-00462-CV, 2010 WL 5019517, at *2 (Tex. App.—Fort Worth Dec. 9, 2010, pet. denied) (mem. op.). Defects in service may be waived through a general appearance. *Baker v. Monsanto Co.*, 111 S.W.3d 158, 161 (Tex. 2003); *Seals v. Upper Trinity Reg'l Water Dist.*, 145 S.W.3d 291, 296 (Tex. App.—Fort Worth 2004, pet. dism'd). A party enters a general appearance when it (1) invokes the judgment of the court on any question other than the court's jurisdiction, (2) recognizes by its acts that a suit is properly pending, or (3) seeks affirmative action from the court. *Exito Elecs. Co. v. Trejo*, 142 S.W.3d 302, 304 (Tex. 2004). "Under this principle, the ultimate test for a general appearance is whether a party requests affirmative relief inconsistent with an assertion that the trial court lacks jurisdiction." *Graves v. DJO, LLC*, 636 S.W.3d 321, 326 (Tex. App.—Fort Worth 2021, pet. filed) (op.

16

on reh'g) (cleaned up); *Arnold v. Price*, 365 S.W.3d 455, 459 (Tex. App.—Fort Worth 2011, no pet.).

A party makes a general appearance when it moves for summary judgment and the motion is not subject to a special appearance. *See Bello*, 2010 WL 5019517, at *3. Taj and Shokravi filed just such a motion and thereby made a general appearance. Hence, any deficiencies in service or personal jurisdiction were waived because they submitted themselves to the trial court's jurisdiction. *See id.*

## VII. CONCLUSION

We affirm the summary judgment.

/s/ Wade Birdwell

Wade Birdwell
Justice

Delivered:  February 17, 2022

17